1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

8  TECK METALS, LTD.,                    )
                                        )   No. CV-05-411-LRS
9                    Plaintiff,         )
                                        )   **ORDER RE MOTIONS FOR**
10                                      )   **SUMMARY JUDGMENT RE**
                                        )   **SCOPE OF COVERAGE**
11        vs.                           )
                                        )
12                                      )
    CERTAIN UNDERWRITERS AT             )
13  LLOYD'S, LONDON AND                 )
    CERTAIN LONDON MARKET               )
14  INSURANCE COMPANIES,                )
                                        )
15                   Defendants.        )
    _____ )
16

17       **BEFORE THE COURT** are Plaintiff's and Defendants' Cross-Motions For

18  Summary Judgment On Scope Of Coverage (Ct. Rec. 389 and 414). These

19  motions were heard with oral argument on July 22. Mark J. Plumer, Esq., argued

20  for the Plaintiff. Gabriel Baker, Esq., argued for Defendants.

21

22  **I. BACKGROUND**

23       Plaintiff Teck Metals, Ltd. (Teck) asks the court to rule as a matter of law

24  that once the London Market Insurance policies are proven to be triggered, the

25  Defendants, collectively referred to as the London Market Insurers (LMI), are

26  liable under each of the policies for all of Teck's losses, up to their full policy

27  **ORDER RE SUMMARY JUDGMENT**
28  **MOTIONS RE SCOPE OF COVERAGE- 1**

limits, without any allocation between LMI and Teck.  This issue arises because the insurers issued serial, successive liability policies (umbrella and excess umbrella) to Teck for the period from August 29, 1972 to June 30, 1985, while Teck's operations in Trail, B.C., date from 1908 to 1995, and its claimed losses have continued  through the present day.  The issue is whether losses should be allocated between insurer and insured when the alleged pollution occurred over many years (1908 or 1930 to 1995)[1], and the insured (Teck) was insured by LMI during only a portion of the entire alleged polluting period (1972 to 1985).

Teck relies on certain language in the Defendants' policies stating as follows:

> The Company hereby agrees, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the Assured for **all sums** which the Assured shall be obligated to pay by reason of the liability
>
> (a) imposed upon the Assured by law,
> or (b) assumed under contract or agreement by the Named Assured . . .
>
> for damages, direct or consequential and expenses, all as more fully defined by the term "ultimate net loss" on account of:-
>
> (i) Personal injuries, including death at any time resulting therefrom,
>
> (ii) Property damage,
>
> (iii) Advertising liability,
>
> caused or arising out of each occurrence happening anywhere in the world.

(Emphasis added).

The existence of similar language in an insurance policy led the Washington Supreme Court in *American National Fire Insurance Company v. B & L Trucking And Construction Company, Inc.*, 134 Wn.2d 413, 429, 951 P.2d 250 (1998), to

---

[1] According to Teck, slag discharging operations commenced in 1930.

**ORDER RE SUMMARY JUDGMENT
MOTIONS RE SCOPE OF COVERAGE- 2**

conclude that once the policy was triggered, the language required the insurer to pay all sums for which the insured became legally obligated, up to the policy limits. "Once coverage is triggered in one or more policy periods, those policies provide full coverage for all continuing damage, without any allocation between insurer and insured." *Id*.

LMI contend, however, that British Columbia (B.C.) law applies and it requires an allocation of damages on a pro rata basis determined by the periods covered by each insurance policy. This approach would require that Teck's losses be spread evenly among all years in which its operations were taking place. LMI do not deny that the result of such an approach is that because the lowest-layer policies provide coverage only once Teck's damages exceed $6 million, Teck would be required to incur losses of $522 million before LMI would have to pay anything ($6 million x 87 years of overall operations (1908-1995)), or alternatively losses of $390 million based on 65 years of slag discharging operations ($6 million x 65 years).

LMI assert the "all sums," joint and several liability approach, requires "an insurer providing excess liability coverage during only a single year of the many decades when Teck's actions polluted the Columbia River basin would be liable up to the limit of its coverage for all damages that any insurer, or Teck itself, would otherwise bear." Teck does not dispute that would be the case. In *B & L Trucking*, the Washington Supreme Court rejected the insurer's argument that the "all sums" approach was unfair because it provides a policyholder who purchases just one year of insurance the same protection as those who purchase insurance annually. The court found that because the insurer had drafted the policy language, it could not now argue its drafting was unfair, and had agreed to pay "all sums" arising out of an "occurrence" which, by its own policy definition, could

**ORDER RE SUMMARY JUDGMENT**
**MOTIONS RE SCOPE OF COVERAGE- 3**

take place over a period of time.  134 Wn.2d at 429-30.  Under an "all sums"
approach, Teck says it "would be entitled to recover all of its losses in excess of
$6 million from any of the periods when the Policies were in effect, up to the per-
occurrence limits of the Policies," provided that one or more of the policies are
proven to have been "triggered."  Whether one or more policies have been
triggered is not at issue at this time and will await determination at a later time.
All that is currently at issue is the scope of potential coverage, not whether
coverage in fact exists.

## II.  DISCUSSION

### A.  Is there a conflict of law?

The policies do not contain choice of law clauses and so this court must
determine whether Washington or B.C. law applies.  Teck contends Washington
law should apply because there is no conflicting B.C. law.

This court is currently exercising 28 U.S.C. Section 1367(a) supplemental
jurisdiction over remaining pendent state law claims against the non-foreign
sovereign Defendants.  This jurisdiction is supplemental to the jurisdiction the
court had been exercising over the foreign sovereign Defendant (Icarom) pursuant
to the Foreign Sovereign Immunities Act.  Icarom is, of course, no longer a party
Defendant.  Because the court is currently exercising supplemental jurisdiction
over pendent state law claims, state choice of law rules, not federal common law
choice of law rules, are controlling.  *Paracor Finance, Inc. v. General Electric
Capital Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996)(where the federal court is
exercising supplemental jurisdiction over state claims, the federal court applies the
choice-of-law rules of the forum state).  Washington employs the Restatement
(Second) of Conflict of Laws, just like the federal common law rules do.  *West*

**ORDER RE SUMMARY JUDGMENT
MOTIONS RE SCOPE OF COVERAGE- 4**

*American Insurance Company v. MacDonald*, 68 Wn.App. 191, 196, 841 P.2d 1313 (1992).

LMI do not dispute that they bear the burden of proving the substance of foreign law, in this case, British Columbia law.  When a party seeks application of foreign law, "the standards of proof of the content of foreign law, as well as the effect of a party's failure to show the content of foreign law," are determined under the law of the forum state.  *Huynh v. Chase Manhattan Bank*, 465 F.3d 992, 1001 (9th Cir. 2006) (citing Restatement § 136).  Under Washington law, a party seeking to invoke foreign law has the burden of proving its substance.  *British Columbia Ministry of Health v. Homewood*, 93 Wn.App. 702, 709-12, 970 P.2d 381 (1999).  Absent "sufficient proof to establish with **reasonable certainty** the substance of foreign principles of law," Washington law applies.  *Id*. at 709 (emphasis added).

Teck contends the issue of scope of coverage- "all sums" versus pro rata allocation- has not been resolved in the British Columbia courts.  Teck relies on an affidavit from Gordon Hilliker, Q.C., a British Columbia lawyer with expertise in Canadian insurance law, who opines there is "no definitive ruling that would be binding on a court in British Columbia" regarding "the allocation of damages for ongoing losses over multiple liability policies and multiple policy periods." Because Washington law regarding the "all sums" approach is settled, whereas British Columbia law regarding the pro rata allocation approach is unsettled, Teck contends there is no conflict and Washington law applies.

LMI contend there is a conflict because British Columbia law "would" yield a different result from Washington law.  According to LMI, the absence of a definitive, binding ruling in British Columbia does not mean there is an absence of a conflict because there is still "sufficient proof to establish with reasonable

**ORDER RE SUMMARY JUDGMENT**
**MOTIONS RE SCOPE OF COVERAGE- 5**

certainty the substance of the principles of law" that would apply in British

Columbia. This proof consists of affidavits from Western Ontario University

Professor of Law Craig Brown and Donald I. Brenner, Q.C., former Chief Justice

of the British Columbia Supreme Court, who both opine that British Columbia

courts would apply a pro rata allocation of damages, rather than joint and several

liability. In support of their opinions, Brown and Brenner cite a 1996 decision of

the British Columbia Court of Appeal, *Surrey (District) v. General Accident*

*Assurance Co. of Canada* 19 B.C.L.R. (3d) 186, 35 C.C.L.I. (2d) 154 (1996),

which affirmed the decision of the trial court (British Columbia Supreme Court),

92 B.C.L.R. (2d) 115, 24 C.C.L.I (2d) 34 (1994).

In *Surrey*, the insurance policy came into force in October 1982, while

flume repairs were undertaken in June 1983, and completed in October of 1983.

Therefore, the policy attached for only one rainy season before the nuisance was

abated. The trial judge at the British Columbia Supreme Court level found it was

impossible to allocate precisely the portion of damage which occurred during the

policy period and therefore, allocated one third of the loss, interest and defense

costs to the insurer. The trial judge relied on the following factors: 1) the erosion

or damage to the flume may have commenced in the 1960s, but more likely began

in 1970s; 2) the erosion was caused by urbanization which progressed at a greater

rate in later years; (3) although the effects of the erosion became evident in 1981

or 1982, the damage would have begun prior to the time that it became evident;

and (4) the erosion continued up until the flume was replaced in 1983. *Id*. at

Paragraphs 34-36. According to the trial judge:

> In view of the difficulties in allocating damage, **I conclude
> that if there were a series of known insurers on the risk, it
> would be appropriate to hold them jointly and severally
> liable to the Insured for the entire risk.** However, the rationale
> for joint and several liability is premised upon the duty of each

**ORDER RE SUMMARY JUDGMENT**
**MOTIONS RE SCOPE OF COVERAGE- 6**

insurer to indemnify for damage that occurred within its policy period. The result sought by Surrey is that the Insurer, who covered the risk for one of the 22 or 23 years in question, would be liable for the damage which ensued over the entire period.

92 B.C.L.R. (2d) 115 at Paragraph 36 (emphasis added).

On appeal, the plaintiff (the insured) alleged this was error and that the insurer should have been found responsible for 100% of the loss. The plaintiff relied upon a California case[2] where the court held that two insurers, who provided the insured with successive coverage of a period of time during which water leakage occurred, were jointly and severally liable for the loss. The plaintiff argued that under this joint and several liability approach, the defendant insurer was responsible for all losses if any of the damage occurred during its policy period and regardless of whether any insurers were on the risk during any part of the period when the damages were caused. (*Id*. at Paragraph 37). The British Columbia Court of Appeal disagreed:

> The [California] case and others cited to us in argument have not been universally accepted in the United States, **and it has not been authoritatively accepted in Canada**.
>
> In any event, **the same problem does not arise in this case because there is no evidence Surrey had coverage prior to October 1982**. Thus, the only question is whether the insurer should be liable for the whole loss because the enrichment occurred during the policy period, or whether there should be allocation of risk as decided by the trial judge.
>
> [T]here are policies that pick up pre-policy damage, but this is not that kind of policy.
>
> Keeping the policy wording in mind ("... for injury to or destruction of property ... during the policy period . . .") and the judge's findings in mind, I cannot say she was wrong in deciding that the loss should be allocated between the insurer and the insured. Similarly I cannot

---

[2] *California Union Insurance Co. v. Landmark Insurance Co.*, 145 Cal. App. 3d 462, 193 Cal. Rptr. 461 (C.A. 1983).

**ORDER RE SUMMARY JUDGMENT**
**MOTIONS RE SCOPE OF COVERAGE- 7**

1    say the trial judge erred in the one-third allocation awarded.

2  (*Id*. at Paragraphs 38-41)(emphasis added).

3      Mr. Hilliker asserts the decision in *Surrey* "does not resolve the issue of

4  allocation of damages for ongoing losses over multiple policies and multiple

5  policy periods," and therefore, it remains an open question under British Columbia

6  law whether there would be an allocation of damages for ongoing losses over

7  multiple liability policies and multiple policy periods.  Professor Brown does not

8  dispute the absence of a binding definitive decision under British Columbia law,

9  but asserts that "should a British Columbia court be faced with the question, it

10 would apply a pro rata approach rather than one based on joint and several

11 liability."  Mr. Brenner also concedes "there are no decided cases directly on

12 point," but asserts that "[a]s a former Justice and Chief Justice of the British

13 Columbia Supreme Court, in those situations where no BC appellate decisions

14 exist, I am uniquely qualified to opine what is reasonably certain to be the law."

15      Professor Brown opines that the *Surrey* case "signals" that British Columbia

16 courts would "likely" apply the pro rata approach, whereas Mr. Brenner goes a

17 step further in asserting *Surrey* indicates how the British Columbia Supreme Court

18 "would decide the issue of allocation." Brown acknowledges, however, that it was

19 only in "*obiter dicta*" that the British Columbia Court of Appeal in *Surrey*

20 declined to apply the joint and several liability approach, noting that it had not

21 been "authoritatively accepted in Canada."  Frankly, it must be asked why the

22 *Surrey* court would bother to say there is nothing "authoritative" about joint and

23 several liability in Canada if there was something already authoritative in Canada,

24 or in British Columbia for that matter, regarding pro rata allocation.  In other

25 words, if the *Surrey* court believed there was something authoritative requiring

26 application of pro rata allocation, why would it have even considered joint and

27 several liability?  And, it is noted that the allocation settled upon by the trial court

28 **ORDER RE SUMMARY JUDGMENT**
**MOTIONS RE SCOPE OF COVERAGE- 8**

in *Surrey* was not a pure pro rata approach based on there being one year of coverage over 22-23 years of damage, but rather a modified pro rata approach at best.

Furthermore, *Surrey* is distinguishable on its facts from the case at bar. In *Surrey*, the defendant insurer asserted there were occurrences prior to 1982 which potentially fell within prior coverage provided by previous insurers. The plaintiff, however, did not identify its previous insurers and took the position that the case was not one in which liability could be apportioned. Thus, in *Surrey*, the loss was apportioned based on there being a single insurer and there being no prior coverage. In the case at bar, there are known successive policies of insurance over a considerable number of years.

Professor Brown asserts that as a matter of insurance law generally, joint and several liability among insurers applies only where two or more policies cover the same risk. In support, Professor Brown cites Canadian law which articulates principles relating to contribution in insurance law. Brown says that according to these principles, "contribution (and therefore joint and several liability) requires, in addition to all policies covering the same subject matter against the same peril for the same insured, that *all the policies must be in force at the time of the loss*." (Emphasis in text). Accordingly, says Brown, "in a case involving serial policies and loss occurring over a long period of time, each policy relates only to that part of the loss occurring during the time period to which it applies. There is no overlapping cover[age] and therefore joint and several liability does not apply."

Brown claims that even in a case such as this one where the harm has occurred over a long period of time making it impossible to attribute aspects of the harm to particular time periods, joint and several liability does not apply. For that proposition, Brown cites a case from the Ontario Court of Appeal, *Alie v. Bertrand*

**ORDER RE SUMMARY JUDGMENT**
**MOTIONS RE SCOPE OF COVERAGE- 9**

& *Frere Construction*, 62 O.R. (3d) 345, 1 C.C.L.I (4th) 166 (2002), which he says would be "highly persuasive" in British Columbia. In *Alie*, the Ontario Court of Appeal found that where the liability issues and the nature of the damages were such that there was no realistic way defense costs could be connected to a specific policy period or an isolated event, it was fair and reasonable to equally distribute defense costs among the seven policy periods and an equal distribution among insurers with a duty to defend. Mr. Brenner claims it is "significant" that the Supreme Court of Canada declined to grant the insured leave to appeal the decision of the Ontario Court of Appeal.

In regard to the *Alie* decision, Teck submits an affidavit from John C. Major who sat on the Supreme Court of Canada for 13 years. Major asserts there is no significance to the Supreme Court of Canada denying leave to appeal in the *Alie* case and that "[n]o legal weight can be taken from the Supreme Court of Canada refusing to grant leave." In his affidavit, Major cites Canadian authorities which appear to support his position. According to Major, while the ruling of the Ontario court may be persuasive to a B.C. court, it cannot be cited as an accurate predictor of what is "reasonably certain" to be the law of B.C.. Hilliker agrees with that assessment and further asserts that the Ontario Court of Appeal dealt with the distinct issue of allocation of defense costs and that "allocation of damages was not even a matter in issue in the Ontario Court of Appeal." He notes also that a non-cumulation clause, discussed below, was not at issue in the *Alie* case.

Professor Brown cites to the decision of the British Columbia Supreme Court in *Lloyd's Underwriters v. Cominco*, 60 B.C.L.R. (4th) 261), 40 C.C.L.I. (4th) 182 (2006), as "signaling" that B.C. courts "would likely apply the *pro rata* approach." That decision, of course, is part of the ongoing litigation in the B.C.

**ORDER RE SUMMARY JUDGMENT**
**MOTIONS RE SCOPE OF COVERAGE- 10**

courts which parallels the litigation before this court.  At issue in that decision was an application by Teck to have B.C. courts decline jurisdiction over insurance coverage issues in favor of the separate coverage proceedings commenced in this U.S. District Court for the Eastern District of Washington.  Justice Davies declined the application, concluding that Teck had "engaged in deliberate and inappropriate forum shopping in an attempt to preclude litigation in British Columbia."  According to Justice Davies:

> I consider it to be a transparent attempt to defeat the Insurers' legitimate expectations that British Columbia law would govern their obligations under the Policies and would coincidentally serve the purpose of garnering to TCML[3] benefits to which it would not otherwise be entitled.  Those benefits would include an "all sums" allocation of insurance proceeds under Washington State law as opposed to "pro rata recovery" from individual Insurers under British Columbia law if coverage under the Polices for alleged environmental losses is found to exist.

It is abundantly clear that all Justice Davies was asked to do was to decide the issue of declining jurisdiction based on *forum non conveniens*.  He was not asked to decide whether the pro rata approach applies in British Columbia.  His comments were mere dicta with no precedential value.  Hilliker and Major concur.  Professor Brown concedes Davies' statement was not "a specific endorsement of the *pro rata* approach."  As the issue of "scope of coverage" was not "actually litigated" before Justice Davies, Teck is not collaterally estopped from arguing to this court that Washington law does not conflict with B.C. law and therefore, that Washington law should apply.

Hilliker takes issue with Brown's reliance on cases involving equitable contribution between insurers as supporting a pro rata approach to the allocation of damages.  Hilliker asserts equitable contribution among insurers is a distinct

---

[3] Teck was previously known as Teck Cominco Metals Ltd. or TCML.

**ORDER RE SUMMARY JUDGMENT**
**MOTIONS RE SCOPE OF COVERAGE- 11**

and different issue:

> The issue in this case, in my opinion, is a different one. It concerns an action brought by the insured for coverage with respect to an ongoing injury in circumstances in which it may be difficult, if not impossible, as a matter of fact to determine the damage which occurred during any particular policy period. It is not a case in which a loss has been paid by one insurer which then, in turn, seeks contribution from another insurer.
>
> There are, in this case, successive policies. The allocation issue concerns what the insured is entitled to recover from each insurer. This is a difficult question, the answer to which is determined by looking at the intent of the parties as evidenced by the language of the policy and applying the policy language to the circumstances of the case.

Hilliker notes the polices at issue here contain a "Prior Insurance Non Cumulation Of Liability" clause which he asserts, at least under American case law, specifically *Chicago Bridge & Iron Co. v. Certain Underwriters at Lloyd's London*, 59 Mass. App. Ct. 646, 797 N.E.2d 434 (2003), has been deemed inconsistent with a pro rata approach. Hilliker says he is unaware of any Canadian court addressing the impact of such a clause. The clause reads:

> It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess policy issued to the Assured prior to the inception date hereof the limit of liability hereon as stated in Item 2 of the Declarations shall be reduced by any amounts due to the Assured on account of such loss under such prior insurance.
>
> Subject to the foregoing paragraph and to all the other terms and conditions of this policy in the event that personal injury or property damage arising out of an occurrence covered hereunder is continuing at the time of the **termination** of this policy the Company will continue to protect the Assured for liability in respect of such personal injury or property damage without payment of additional premium.

(Emphasis added).

This is identical to the clause at issue in *Chicago Bridge* which the court there found "did not confine the extent of coverage to the policy period in which

**ORDER RE SUMMARY JUDGMENT**
**MOTIONS RE SCOPE OF COVERAGE- 12**

the property damage occurred" and which the court deemed "superfluous had the drafter intended that damages would be allocated among insurers based on their respective time on the risk." 797 N.E.2d at 441.   In his June 9 affidavit (Ct. Rec. 447), Hilliker errantly misquotes the clause, inserting the word "inception" for the word "termination."  In a responding affidavit, Brown asserts the inclusion of the word "termination" changes the meaning of the clause such that the intent is to avoid overlapping coverage and therefore, joint and several liability.  As noted, however, the *Chicago Bridge* court considered the clause with the word "termination" in it and still found it was inconsistent with a pro rata approach.[4] Says Hilliker about the non-cumulation clause:

> [It] specifically applies in the situation in which a single loss is covered under successive policies, which I understand to be the case here.  In such a circumstance, the non-cumulation clause, read together with the other provisions in the policy, including the provision that there is deemed to be one occurrence[5], supports the conclusion that all sums payable in respect of an indivisible injury, regardless of the fact the injury was caused by exposure to conditions both during and before the policy period, are covered under a single

---

[4] In yet another affidavit filed on July 1 (Ct. Rec. 471), Hilliker acknowledges his typographical error, but states his opinion remains unchanged.

[5] According to the policies:

The term "Occurrence" wherever used herein shall mean an accident or a happening or an event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage, or advertising liability during the policy period.  **All such exposure to substantially the same general conditions existing or emanating from one premises location shall be deemed one occurrence**.  (Emphasis added).

**ORDER RE SUMMARY JUDGMENT
MOTIONS RE SCOPE OF COVERAGE- 13**

policy, subject to the provision that the limits of liability are reduced by any amounts due under prior insurance.

Professor Brown "respectfully disagree[s] with this interpretation" and in his "view," the clause "would be interpreted as manifesting an intention to *avoid* overlapping cover[age] and therefore, joint and several liability."

Ultimately, a British Columbia court and/or the Supreme Court of Canada is going to authoritatively decide whether a pro rata allocation approach or a joint and several liability approach applies under the circumstances present here. This United States District Court for the Eastern District of Washington cannot, and should not, predict what the Canadian courts will do, nor is it entitled to assume Brown and Brenner will be correct in their prediction that a pro rata approach will be applied, instead of a joint and several liability approach. The mere fact there is such a contentious debate between Hilliker and Major on one side, and Brown and Brenner on the other, indicates it is an open question in Canada, and not "reasonably certain," that a pro rata approach would be utilized considering the particular policy language and factual circumstances involved here. This court must disagree with the Defendants' contention that "there is extensive authority, including a binding B.C. decision [*Surrey*], which points overwhelmingly toward a single conclusion regarding the content of B.C. law."

This court finds there is no actual conflict of law and therefore, that the law of Washington applies (the "all sums" approach). The Defendants have not offered sufficient proof to establish with reasonable certainty the substance of foreign principles of law that would apply regarding the particular policy language and factual circumstances involved in the case at bar.

**B.  Assuming there is a conflict, what law applies- B.C. or Washington?**

**ORDER RE SUMMARY JUDGMENT
MOTIONS RE SCOPE OF COVERAGE- 14**

Under the Restatement (Second) of Conflict of Laws ("Restatement") §§ 6 and 188, a court applies the law of the forum that has the "most significant relationship" to the dispute.  Teck asserts that even under that analysis, Washington law applies because the location of the contaminated site (the Upper Columbia River or "UCR") is in Washington.  Citing *Canron, Inc. v. Fed. Ins. Co.*, 82 Wn. App. 480, 918 P.2d 937 (1996), among other cases, Teck asserts the location of the contaminated site is accorded paramount importance because that jurisdiction has the strongest interest in the cleanup of the site.  LMI disagree and contend that based on consideration of the various factors, British Columbia has the "most significant relationship" with the parties' insurance coverage dispute.

Under Section 6, the court considers the following factors: 1) the respective interests of the two forums; 2) the parties' expectations; 3) certainty and predictability of result; 4) ease in determination and application of law; 5) needs of interstate and international systems; and 5) policies underlying the field of law. LMI contend that while both Washington and British Columbia may have policies that support the application of their law, the parties' clear expectations were that British Columbia law would apply.  *Mulcahy v. Farmers Ins. Co. of Washington*, 152 Wn.2d 92, 101, 95 P.3d 313 (2004)("the expectations of the parties to the contract may significantly tip the scales in favor of one jurisdiction's law being applied over another's").

LMI quote the Restatement §6, Comment d, that "[c]hoice-of-law rules, among other things, should seek to further the harmonious relations between states and to facilitate commercial intercourse between them."  In that regard, LMI note that the Supreme Court of Canada, in affirming denial of Teck's application to have British Columbia courts decline jurisdiction over the coverage dispute, reasoned that "Teck's alleged wrongful actions occurred solely in Canada, the

**ORDER RE SUMMARY JUDGMENT**
**MOTIONS RE SCOPE OF COVERAGE- 15**

proceedings involved other British Columbia sites with no connection to Washington State, and the Washington residents are not beneficiaries to the policies." *Teck Cominco Metals Ltd. v. Lloyd's Underwriters*, 2009 SCC 11, [2009] 1 S.C.R. 321, ¶ 35.[6] Unfortunately for Teck, the Ninth Circuit U.S. Court of Appeals see things differently in having effectively found that Teck's alleged wrongful actions occurred in the United States by virtue of hazardous elements being released from slag discharged by Teck in Trail, B.C., and coming to rest within the UCR in the United States. *Pakootas v. Teck Cominco Metals, Ltd.*, 452 F.3d 1066, 1078 (9th Cir. 2006). Teck commenced its declaratory judgment action and asserted personal jurisdiction over the insurers because the United States District Court (Hon. Alan A. McDonald) had previously found that Teck itself was subject to personal jurisdiction for alleged harm it caused within the United States. (Ct. Rec. 58 in CV-04-256-LRS at pp. 3-7).[7]

---

[6] LMI assert the Supreme Court of Canada's decision is a "final decision on the merits" which "determined that British Columbia law applies to the coverage dispute." That simply is not true. All the Supreme Court of Canada did was review the trial court's (British Columbia Supreme Court's) decision declining Teck's application to have the British Columbia courts decline jurisdiction and stay the B.C. coverage action commenced by the insurers.

[7] The Ninth Circuit Court of Appeals "adopted" Judge McDonald's conclusion that there was personal jurisdiction over Teck based on Washington State's long-arm statute. *Pakootas*, 452 F.3d at 1076 n. 16.

**ORDER RE SUMMARY JUDGMENT**
**MOTIONS RE SCOPE OF COVERAGE- 16**

Under Section 188 of the Restatement, five principal factors are considered in determining which jurisdiction has the "most significant relationship" to the dispute and therefore, whose law should apply.   These factors are: 1) the place of contracting; 2) the place of negotiation of the contract; 3) the place of performance; 4) the location of the subject matter of the contract; and 5) the domicile, residence, nationality, place of incorporation and place of business of the parties.  Restatement §188(2).  "These [factors] are to be evaluated according to their relative importance with respect to the particular issue[,] and in conjunction with the principles set forth in section 6 of the Restatement."  *Id*.  LMI contend that each factor supports the conclusion that British Columbia law should apply, "as would be expected for an insurance contract negotiated, completed, and to be performed in British Columbia, for the benefit of a British Columbia-domiciled company [Teck] that sought principally to insure its extensive British Columbia operations and operations elsewhere in Canada."   LMI further assert that "Teck had no operations in Washington during the relevant policy periods and has claimed in the underlying *Pakootas* matter that its ties to Washington remain so sparse as not to meet even the Due Process Clause's low threshold permitting U.S. courts to assert jurisdiction over it."

When the suit was filed against Teck in *Pakootas* in July 2004 (CV-04-256-LRS), Teck immediately challenged this court's exercise of personal jurisdiction over it, and further asserted the Environmental Protection Agency's (EPA's) Unilateral Administrative Order (UAO) could not be enforced against a Canadian corporation based on conduct which occurred in Canada.  Judge McDonald ruled against Teck, prompting an appeal by Teck to the Ninth Circuit and eventually to the U.S. Supreme Court before Teck entered into a settlement agreement with the EPA.  The Ninth Circuit found that it was not Teck's conduct in Canada which the

**ORDER RE SUMMARY JUDGMENT**
**MOTIONS RE SCOPE OF COVERAGE- 17**

1  EPA sought to regulate (not an extraterritorial application of the Comprehensive

2  Environmental Response, Compensation and Liability Act (CERCLA) as found by

3  Judge McDonald).   Instead, EPA was concerned with the "releases" from the slag

4  Teck had discharged into the river and these "releases" occurred in the Upper

5  Columbia River within the United States.

6         Subsequent to Judge McDonald's denial of its motion to dismiss, but prior

7  to the Ninth Circuit's ruling on appeal, Teck commenced this declaratory

8  judgment action against its insurers, including the LMI.  The insurers moved to

9  dismiss the action based on lack of personal jurisdiction.   In its May 1, 2006 order

10 denying that motion, this court found that:

> Documentation in the record also establishes that the Umbrella
> Policies, and consequently the Excess Umbrella Policies, insured
> Cominco American, Inc. With facilities in Washington and other
> states, as well as multiple sites around the world.  The terms of
> the Umbrella Policies applied to all of TCML's listed sites.
> [Citation omitted].  Therefore . . . LMI [London Market Insurers]
> contracted to insure property within Washington at the time of
> contracting, consistent with RCW 4.28.185(d) [Washington's Long-
> Arm Statute].

16 (Ct. Rec. 174 at pp. 8-9).

17        After finding that Washington's Long-Arm Statute conferred personal

18 jurisdiction over the insurers, this court analyzed whether the insurers had

19 sufficient "minimum contacts" with the State of Washington such that it was "fair"

20 to exercise jurisdiction over them under the Due Process Clause.  In finding it was

21 "fair" to exercise jurisdiction over the insurers, this court noted:

> LMI attempt[s] to defeat the foreseeability element by denying
> any expectation of being haled into Washington, or the U.S., for
> contract interpretation. They urge the court to differentiate between
> litigation over damages and litigation over coverage.  The court
> finds this argument unpersuasive, based on the very terms of the
> Umbrella Policies, which provide that claims arising in certain
> countries (e.g., Albania, Bulgaria, Cuba, etc.) "are covered only
> if the claim based thereon is initially made or suit to recover
> therefor is originally brought within Canada or the United States

27 **ORDER RE SUMMARY JUDGMENT**
28 **MOTIONS RE SCOPE OF COVERAGE- 18**

> of America . . . ." [Citation omitted]. The Umbrella Policies themselves attest to the insurers' expectations that they would be haled into U.S. courts for claims and suits to recover. This clause not only satisfies the foreseeability test, it also bolsters the degree of purposeful availment, in that the insurers clearly anticipated invoking the benefits and protection of U.S. courts.

(Ct. Rec. 174 at pp. 11-12)(Emphasis in text).

This court found that "sovereignty factors" did not weigh against personal jurisdiction because the "foreign defendants provide world-wide insurance coverage, with agents throughout the U.S. and Canada" and because "any conflicts with 'fundamental substantive social policies' may be resolved through choice of law rules, not jurisdiction." (Ct. Rec. 174 at pp. 14-15).

As part of its due process analysis, this court also considered the forum state's interest in adjudicating the dispute and, citing *Canron*, 82 Wn. App. at 494, concluded that:

> Washington has a strong and well-established interest in protecting the health and safety of its citizens; to that end, it has a compelling interest in the insurers' obligation to indemnify, especially, as in the case, at the remediation stage of a polluted site within its borders.

(Ct. Rec. 174 at p.15).

In its order, the court also denied the insurers' motion to dismiss for *forum non conveniens*. In doing so, this court deferred engaging in a choice of law analysis to determine what law would govern the dispute. This court noted a choice of law analysis was not necessary in a *forum non conveniens* determination, that the law to be applied "relates to insurance contract interpretation, not environmental law or CERCLA," and that since the case did "not involve a U.S. statute requiring venue within the U.S., the court declines to engage in a lengthy choice of law analysis at this time." (Ct. Rec. 174 at pp. 21-22).

Although determining the existence of personal jurisdiction and the proper

**ORDER RE SUMMARY JUDGMENT
MOTIONS RE SCOPE OF COVERAGE- 19**

forum (venue) are distinct from a determination of the substantive law governing the parties' dispute, there is no doubt this court's determination regarding personal jurisdiction and venue has implications for its choice of law analysis. LMI argue that *Canron* does not support Teck's assertion that the location of the contaminated site is of paramount importance in determining which jurisdiction's law should apply to the parties' dispute. Canron was a Canadian corporation that manufactured galvanized steel products in Vancouver, B.C.. It shipped byproducts of the galvanizing process, including "spent pickle liquor" containing zinc to Western Processing located in Kent, Washington. After Canron settled claims against it for zinc contamination at the Kent facility, it brought a declaratory judgment action against its insurer (Federal). Following a jury verdict for the insurer, both parties appealed. On cross-appeal, the insurer argued the trial court erred by applying the law of Washington, rather than the law of Quebec, contending the insurance contract had been entered into in Quebec. Applying the Restatement (Second) Conflict of Laws §§ 6 and 188, the Washington Court of Appeals concluded the trial court had not erred in applying Washington law:

> Although Quebec was the place of negotiating and entering the contract, Quebec has no significant relationship to the issues in this case. Neither Canron nor Federal is a Quebec corporation. . . . The ministerial acts of negotiating and executing the contracts do not amount to significant contacts in relation to the issues in this case.
>
> **Further, the parties understood the contracts covered multiple risks in multiple locations, including the galvanizing plant in British Columbia.** The plant's wastes were shipped from British Columbia. British Columbia would best be considered the location of the subject matter in relation to the issues in this case, but neither party argues that British Columbia law applies, so it is presumed British Columbia law is the same as Washington law. [Citation omitted].
>
> **Washington has a paramount interest in the health and safety of its people. Washington bears the responsibility under CERCLA for ensuring the site cleanup and will bear the burden if the site is**

**ORDER RE SUMMARY JUDGMENT**
**MOTIONS RE SCOPE OF COVERAGE- 20**

1

**not cleaned.  The existence or absence of insurance proceeds can determine whether or not a hazardous waste site is remediated. Washington , therefore, has a significant interest in Canron's insurance coverage.  Washington's contacts with the issues in this case are significant, while Quebec's are not.**

82 Wn.App. at 493-94.  (Emphasis added).

The *Canron* court did not have to make a decision that Washington law applied instead of British Columbia law because there was no assertion that British Columbia law applied, or that it conflicted with Washington law.  Contrary to the assertion of LMI, the court in *Canron* did not hold that British Columbia law applied to coverage of environmental damage in Washington state.  The court stated only that British Columbia would be considered the location of the subject matter in relation to the case.  This is but one of the Section 188(2) factors. Contrary to the contention of LMI, *Canron's* holding does not "clearly support[] application of British Columbia law here."

Like the insurance contract in *Canron*, the insurance contracts in the case at bar cover multiple risks in multiple locations, including Washington and sites around the world.  Consequently, LMIs' reliance on *Dairyland Ins. Co. v. State Farm Mutual Auto Ins. Co.*, 41 Wn.App. 26, 31, 701 P.2d 806 (1985), is misplaced.  In *Dairyland*, the court held Idaho law governed the insurance coverage of the owner of a vehicle that was involved in an accident in Washington.  The owner was a passenger in the vehicle being driven by a Washington resident at the time of the accident.  Because the policy was issued in Idaho to an Idaho resident, that being the owner of the vehicle who drove the vehicle mainly in Idaho, "the principal location of the risk and the cost of the policy were presumably established according to Idaho law."  *Id*. at 32, citing Restatement (Second) Conflict of Laws §193.  Where there are multiple principal locations of risk under a policy or policies, however, §193 does not control.

**ORDER RE SUMMARY JUDGMENT**
**MOTIONS RE SCOPE OF COVERAGE- 21**

1    *Canron*, 82 Wn.App at 494 n. 7.

2       The LMI policies at issue here clearly insure multiple principal locations of

3 risk, indeed provide worldwide coverage.  Because those policies covered the risk

4 in the Upper Columbia River in Washington, located only a few miles downstream

5 from the Trail smelting operation, it was a reasonable expectation of the insured

6 and the insurers that Washington law might apply to interpretation of their

7 insurance contracts.  The insured risk "'understood' by the parties at the time of

8 contracting" included sites outside of British Columbia.  *Fluke Corp. v. Hartford*

9 *Acc. & Indem. Co.*, 145 Wn.2d 137, 34 P.3d 809, 816-17 (2001), affirming 102

10 Wn.App. 237, 7 P.3d 825 (2000).  Of course, "the parties' expectations" is but one

11 of the Section 6 factors, but as stated in *Mulcahy*, 152 Wn.2d at 101, "the

12 expectations of the parties to the contract may significantly tip the scales in favor

13 of one jurisdiction's law being applied over another's."  It cannot be said that the

14 location of the "contaminated site" always dictates the choice of law in an

15 environmental insurance coverage suit, otherwise there would be no need for the

16 other factors set forth in Sections 6 and 188 of the Restatement.[8]  Certainly,

17 however, Washington's interest is that the Upper Columbia River site be cleaned

18 up and that has to be taken into consideration ("respective interests of the two

19 forums").  The "certainty and predictability of result" and "ease in determination

20 and application of law" factors also favor application of Washington law because,

21 as discussed above, Washington law is settled on the scope of coverage with

22 regard to the particular policy language and factual circumstances involved in this

23 case, whereas British Columbia law is not.

24

25       [8] See *Fluke Corp. v. Hartford Acc. & Indem. Co.*, 102 Wn.App. 237, 250, 7

26 P.3d 825 (2000).

27 **ORDER RE SUMMARY JUDGMENT**

28 **MOTIONS RE SCOPE OF COVERAGE- 22**

1     In *Canron*, the court concluded "British Columbia would best be considered

2   the location of the subject matter in relation to this case," even though the

3   contaminated site at issue was in Kent, Washington.  Thus, the argument can be

4   made in the instant case that "the location of the subject matter" is Teck's smelting

5   operation in Trail, B.C.  That argument would carry more heft if the Ninth Circuit

6   had agreed with Judge McDonald that the "releases" at issue were from the Trail

7   plant and that an extraterritorial application of CERCLA was necessary and

8   permissible.  The Ninth Circuit did not agree.  It found the "releases" occurred in

9   Washington in the Upper Columbia River site when harmful elements were

10  released from slag which had been discharged from the Trail plant and eventually

11  settled in the Upper Columbia River site.

12     It appears LMI do not dispute that their policies are created in London,

13  England.   It also appears, however, that the particular policies at issue in this case

14  were issued to Teck in British Columbia through its B.C. insurance broker and that

15  negotiations regarding the same were conducted in B.C..  Teck is incorporated in

16  Canada with its headquarters in  B.C..  It is not a "Washington insured."  While

17  LMI are generally based in London, England, Teck points out that some of the

18  Lloyd's names that subscribed to the policies issued to Teck have confirmed they

19  are residents of Washington.  LMI do not dispute that, other than to note this is an

20  "insignificant" number "compared to the hundreds and perhaps thousands who are

21  implicated in this suit."  The "place of performance" appears to be B.C. because

22  premiums were paid from Teck's headquarters in B.C., and in the event LMI are

23  obligated to indemnify Teck, they will pay Teck at those headquarters. *Fluke*, 102

24  Wn.App. at 252 ("The execution, negotiation, and performance of Hartford's

25  contract with Fluke all took place in Washington.  Fluke has its headquarters in

26  Washington, and Hartford also has its offices in Washington").  Although the

27  **ORDER RE SUMMARY JUDGMENT**
28  **MOTIONS RE SCOPE OF COVERAGE- 23**

indemnification would relate to the environmental remediation in Washington, this is first and foremost an insurance coverage dispute between the parties. The "performance" at issue is the performance of insurance contract obligations. As discussed above, however, the location of the subject matter of the policies extends beyond B.C. and includes sites in Washington and elsewhere. While the majority of Teck's operations are in B.C., it was understood by Teck and LMI that those operations created risks of liability beyond the borders of B.C. and thus, the policies were created to cover those risks.

LMI contend the clear expectation of the parties was that British Columbia law apply, offering a statement from a Richard Youell, a lead underwriter on several of the London policies that:

> As an underwriter providing coverage to an insured with its principal place of business in Canada through policies denominated in Canadian dollars for premiums stated in Canadian dollars, my expectation and, I believe, the reasonable expectation of other underwriters and of the Insured, is that any dispute arising in connection with the obligations of the insurers or the Insured pursuant to the policies, would be decided in accordance with the law of the applicable Canadian province and in a Canadian court.

A "Service Of Suit Clause" in one or more of the policies provided that LMI "at the request of the Assured, will submit to the jurisdiction of any Court of competent jurisdiction within Canada and will comply with all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court." And as noted, in his decision in the parallel B.C. coverage action, Justice Davies of the British Columbia Supreme Court referred to "the legitimate expectations" of the insurers "that British Columbia law would govern their obligations under the [p]olicies."

As legitimate an expectation by the insured, and the insurers for that matter, is that Washington law might apply to policies insuring risk worldwide where the

**ORDER RE SUMMARY JUDGMENT**
**MOTIONS RE SCOPE OF COVERAGE- 24**

alleged wrongful action and the alleged damage occurred in Washington, only a few miles from the Trail smelting operation.  Furthermore, Washington's interest in remedying that damage is just as compelling as B.C.'s interest in protecting what it perceives to be the legitimate expectations of insurers who do business in that province.  "The most significant relationship test does not involve simply counting contacts.  **The relative policies and interests of the states in the subject matter of the contract must also be considered.**" *Dairyland Ins.*, 41 Wn.App. at 31. (Emphasis added).

If there were a conflict, this court would conclude that Washington has a more significant relationship to the parties' coverage dispute based on consideration of the Restatement factors and the totality of the circumstances, and therefore that Washington law would apply.

## III.  CONCLUSION

Because there is no conflict between the law of Washington and British Columbia, Washington law applies and the "all sums" approach will govern the scope of coverage provided to Teck by the LMI policies.  There are no issues of material fact which preclude the court from making this determination as a matter of law, and the court finds no need to await the conducting of additional discovery before making this determination.   Resolution of this question turns on interpretation of the language of the policies and the applicable law.  Accordingly, Plaintiff's Motion For Summary Judgment On Scope Of Coverage (Ct. Rec. 389) is **GRANTED**, and Defendants' Cross-Motion For Summary Judgment On Scope Of Coverage (Ct. Rec. 414) is **DENIED**.  Plaintiff's Motion To Strike London Insurers' Reply On Scope Of Coverage (Ct. Rec. 468) is **DENIED** as moot.

At this time, the court declines to make any rulings, or otherwise speculate,

**ORDER RE SUMMARY JUDGMENT**
**MOTIONS RE SCOPE OF COVERAGE- 25**

as to application of the "all sums" approach to the policies at issue.  The parties may conduct whatever additional discovery is necessary, and file whatever additional motions are necessary, for resolution of how the "all sums" approach is to be applied to the subject policies.[9]  The court also declines to strike any specific affirmative defenses asserted by LMI.  The impact of the court's legal ruling upon affirmative defenses will manifest itself in due course.

**IT IS SO ORDERED.**  The District Court Executive is directed to enter this order and to provide copies to counsel of record.

**DATED** this 9<u>th</u> day of August, 2010.


_s/ Lonny R. Suko_
LONNY R. SUKO
Chief United States District Court Judge

_____

[9] Defendants' request for a Fed. R. Civ. P. 56(f) continuance is **DENIED** as moot in that additional discovery is not necessary to resolve the issues which have been resolved as a matter of law, namely that there is no conflict of law, and even assuming there was one, the "significant relationship" test would favor application of Washington law.

**ORDER RE SUMMARY JUDGMENT**
**MOTIONS RE SCOPE OF COVERAGE- 26**