UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| TECK METALS, LTD.,<br><br>          Plaintiff,<br><br>  vs.<br><br>CERTAIN UNDERWRITERS AT LLOYD'S, LONDON AND CERTAIN LONDON MARKET INSURANCE COMPANIES,<br><br>          Defendants. | No. CV-05-411-LRS<br><br>**ORDER RE MOTIONS FOR SUMMARY JUDGMENT RE QUALIFIED POLLUTION EXCLUSION CLAUSE** |

**BEFORE THE COURT** are Plaintiff's and Defendants' Cross-Motions For Summary Judgment Re The Qualified Pollution Exclusion Clause (Ct. Rec. 382 and 424). These motions were heard with oral argument on July 22. David F. Klein, Esq., argued for the Plaintiff. Gabriel Baker, Esq., argued for Defendants.

**I. BACKGROUND**

This motion presents the same threshold issues which have been addressed in the court's "Order Re Motions For Summary Judgment Re Scope Of Coverage," namely: 1) is there an actual conflict between British Columbia law and Washington law?; and 2) if there is, does British Columbia or Washington have

**ORDER RE SUMMARY JUDGMENT MOTIONS
RE QUALIFIED POLLUTION EXCLUSION CLAUSE- 1**

the "most significant relationship" to the coverage dispute so as to warrant application of its law?

The London Market Insurance policies contain an "Industries, Seepage, Pollution and Contamination Clause," aka "Qualified Pollution Exclusion Clause" which provides in relevant part:

> This insurance does not cover any liability for:
>
> (1) . . . damage to, or loss of use of property directly or indirectly caused by seepage, pollution or contamination, **provided always that this Paragraph (1) shall not apply . . . where such seepage, pollution, or contamination is caused by a *sudden, unintended and unexpected happening* during the period of this insurance.**
>
> (2) The cost of removing, nullifying, or cleaning-up seeping, polluting or contaminating substances unless the seepage, pollution or contamination is caused by a ***sudden, unintended and unexpected happening*** during the period of this Insurance.

In *Queen City Farms, Inc. v. Central National Insurance Co. of Omaha*, 126 Wn.2d 50, 95, 882 P.2d 703 (1994), the Washington Supreme Court construed an identical clause and concluded that reading "sudden" to include a temporal limitation was problematic because it did "not make sense to speak of an abrupt, instantaneous seepage or leakage, nor of seepage or leakage occurring over a short period of time." The court found the language ambiguous, construed it against the insurer, refused to adopt any requirement of temporal suddenness and held coverage would be provided for any "unexpected and unintended" polluting event. *Id*.

## II. DISCUSSION

### A. Is there an actual conflict with B.C. law?

This court concludes there is not "sufficient proof to establish with reasonable certainty" that under principles of British Columbia law, British

**ORDER RE SUMMARY JUDGMENT MOTIONS**
**RE QUALIFIED POLLUTION EXCLUSION CLAUSE- 2**

Columbia courts would necessarily reach a different conclusion than Washington courts regarding the specific language contained in the particular qualified pollution exclusion clause at issue.

Defendant's expert, Professor Brown, acknowledges that the British Columbia Supreme Court's decision in *Privest Properties Ltd. v. Foundation Co. of Canada*, 57 B.C.L.R (2d) 88, 6 C.C.L.I. (2d) 23 (1991) at Paragraph 309, contains *obiter dicta* "to the effect that the terms 'sudden' and 'accidental' in a pollution exclusion clause refer to separate concepts." In *Privest*, the pollution exclusion clauses dictated exclusion unless the discharge, dispersal or release was not "sudden or accidental." The London Market Insurers (LMI) claim the court's framing of the question - "Was it continuous or was it sudden? Was it accidental"- shows the court considered the term "sudden" to contain a temporal element, but Professor Brown concedes that the court was not presented with, and did not rule upon, the specific question of whether "sudden" and "accidental" refer to separate concepts. Defendant's expert, Brenner, asserts the judge in *Privest* "**held** that sudden contains a temporal element," (emphasis added), but that is contrary to even Professor Brown's conclusion.

Professor Brown acknowledges the term "sudden" can be "used as a synonym for unintended or unexpected," but asserts the "ordinary meaning of the word 'sudden,' when viewed as something different from unintended or unexpected, incorporates a temporal element." Therein lies the problem and why the Washington Supreme Court found the term "sudden" to be ambiguous in the particular pollution exclusion clause at issue in the *Queen City Farms* case. Professor Brown acknowledges the term has the potential to be considered ambiguous, but his view is it is not ambiguous and furthermore, the "resolution of the ambiguity would . . . be constrained by the concept of reasonable expectations

**ORDER RE SUMMARY JUDGMENT MOTIONS**
**RE QUALIFIED POLLUTION EXCLUSION CLAUSE- 3**

of the parties, including the insurer." Professor Brown says his conclusion is based on "binding principles of policy interpretation applied in Canada including British Columbia" and contends that "[i]f the exclusion was given the meaning advanced by [Teck], it is difficult to see in what circumstances it would apply." Actually, however, if the word "sudden" is not deemed to include a temporal element, the exclusion still applies if the damage was not "unexpected or unintended," as held by the Washington Supreme Court in *Queen City Farms*.

     LMI also resort to reliance on trial court decisions from Ontario which, although perhaps persuasive to a B.C. court, are not binding on a B.C. court. The phrase at issue in those cases was "sudden and accidental" which was construed as having a temporal element. Arguably, the phrase "sudden **and** accidental" more likely suggests a distinction in those terms than "sudden **or** accidental." (Emphasis added). That said, the affidavit of Plaintiff's expert, Hilliker, addresses these Ontario decisions and explains that not only are they not binding in B.C., but he further asserts they are not consistent with each other and do not even settle the law in Ontario.

     The competing affidavits of Hilliker and Brown reveal the law is not settled in B.C. regarding how a B.C. court would interpret the particular qualified pollution exclusion clause at issue here. It is not "reasonably certain" that a B.C. court would conclude that the term "sudden" in this particular clause contains a temporal element. As a matter of law, the court concludes there is no conflict and accordingly, per Washington law as set forth in the *Queen City Farms* decision*,* the term "sudden" in the qualified pollution exclusion clause at issue here does not contain a temporal element distinct from the terms "unexpected and unintended."

//
//

**ORDER RE SUMMARY JUDGMENT MOTIONS**
**RE QUALIFIED POLLUTION EXCLUSION CLAUSE- 4**

**B. If there is a conflict, should B.C. or Washington law apply?**

For the reasons specified in its "Order Re Motions For Summary Judgment Re Scope Of Coverage," this court concludes Washington has the "most significant relationship" to the parties' coverage dispute and therefore, if there is a conflict, Washington law would apply.

**C. Extrinsic Evidence Re Term "Sudden"**

LMI contend that even if Washington law applies, there is extrinsic evidence indicating Teck understood the term "sudden" to contain a temporal element. Accordingly, LMI contend the language in the clause is not ambiguous.

"Extrinsic evidence is admissible to assist the court in ascertaining the parties' intent and interpreting the contract," and only "[a]fter examining the available extrinsic evidence" may any remaining ambiguity be resolved against the insurer. *Moeller v. Farmers Insurance Co. of Washington*, 155 Wn.App. 133, 141, 229 P.3d 857 (2010). In *Queen City Farms*, the state supreme court observed that there was "no extrinsic evidence as to the parties' intent," but it also noted that "while evidence of the parties' mutual intent may be helpful in some contexts, we have recognized that sometimes language in standard policies does not involve mutual negotiations between the insurers and the insureds." 126 Wn.2d at 82. Thus, the court concluded it was "left with ambiguity in a nonnegotiated standard form insurance provision." *Id*. at 83. "Where there are actual negotiations, the context principle, as appropriately limited by its definition, permits admission, and examination of extrinsic evidence." *Lynott v. National Union Fire Ins. Co.*, 123

**ORDER RE SUMMARY JUDGMENT MOTIONS
RE QUALIFIED POLLUTION EXCLUSION CLAUSE- 5**

Wn.2d 678, 684, 871 P.2d 146 (1994).[1]

It is not apparent to this court from any of the extrinsic evidence cited by LMI in its June 23 reply brief (Ct. Rec. 455 at pp. 5-11) that there was actual negotiation between Teck **and LMI** regarding the qualified pollution exclusion clause contained in the policies. The evidence consists primarily of statements made by Teck officials to Teck's insurance broker, and statements by the broker to Teck officials. It is not apparent from the evidence that the broker actually negotiated with LMI regarding the clause. Thus, even if this evidence somehow shows that Teck unilaterally concluded that only temporally abrupt happenings were covered, that does not resolve the ambiguity of the term "sudden" contained in the qualified pollution exclusion clause. "Unilateral or subjective purposes and intentions about the meanings of what is written do not constitute evidence of the **parties'** intentions." *Lynott*, 123 Wn.2d at 684 (emphasis added). LMI asserts the *Queen City Farms* court would have reached a different outcome if, as here, extrinsic evidence of the insured's interpretation of 'sudden' had eliminated potential ambiguity." (Ct. Rec. 455 at p. 10). Again, what is necessary is not extrinsic evidence of a party's unilateral interpretation or intent, but rather extrinsic evidence of the parties' mutual intent which, in the insurance context, arises from actual mutual negotiations that took place between them. The court has yet to be presented with extrinsic evidence of the latter.

The court recognizes discovery is ongoing and the fact discovery deadline is November 15, 2010. Accordingly, it is possible that extrinsic evidence may be

---

[1] The "context principle" or "context rule" is that ambiguity in the meaning of contract language need not exist before evidence surrounding the making of the contract is admissible. *Lynott*, 123 Wn.2d at 683, citing *Berg v. Hudesman*, 115 Wn.2d 657, 801 P.2d 222 (1990).

**ORDER RE SUMMARY JUDGMENT MOTIONS**
**RE QUALIFIED POLLUTION EXCLUSION CLAUSE- 6**

discovered which is relevant to the parties' mutual intent and the existence of mutual negotiations between them regarding the qualified pollution exclusion clause. At this time, the court finds as a matter of law, based on the language of the clause and the applicable Washington law, that the term "sudden" does not contain a temporal element. The court will not, however, preclude Defendants from filing a motion at a later date based on newly discovered extrinsic evidence which Defendants contend establishes that the parties mutually understood, pursuant to actual mutual negotiations, that the term "sudden" has a temporal meaning.

### D.  What Is The Relevant "Happening" Under Washington law?

Teck asks the court to find as a matter of law that the relevant "happening" is the release of hazardous substances from the slag which occurred after the slag was carried across the border and settled in certain portions of the Upper Columbia River (UCR) site in the United States. LMI ask the court to find as a matter of law that the relevant "happening" is the initial discharge from the Trail, B.C. smelter, that this was not "unintended or unexpected," and therefore, that the pollution exclusion clause applies.

According to the LMI policies:

> **The term "Occurrence" wherever used herein shall mean an accident or a <u>happening</u> or an event or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage, or advertising <u>liability</u> during the policy period**. All such exposure to substantially the same general conditions existing or emanating from one premises location shall be deemed one occurrence.

(Emphasis added).

The plain language of this clause indicates the relevant "happening" is one

**ORDER RE SUMMARY JUDGMENT MOTIONS**
**RE QUALIFIED POLLUTION EXCLUSION CLAUSE- 7**

which gives rise to liability. This makes senses since, of course, the LMI policies are liability policies. At issue in the *Pakootas* case is Teck's potential liability under CERCLA and it is this for which Teck seeks insurance coverage in the captioned matter. According to the Ninth Circuit Court of Appeals:

> [T]he operative event creating a liability under CERCLA is the release or threatened release of a hazardous substance. *See* [42 U.S.C.] § 9607(a)(4). **Arranging for disposal of such substances, in and of itself, does not trigger CERCLA liability, <u>nor does actual disposal of hazardous substances</u>.** A release must occur or be threatened before CERCLA is triggered. A party that "arranged for disposal" of a hazardous substance under § 9607(a)(3) does not become liable under CERCLA until there is an actual or threatened release of that substance in to the environment. Arranging for disposal of hazardous substances, in itself, is neither regulated nor prohibited under CERCLA. **Further, disposal activities that were legal when conducted can nevertheless give rise to liability under § 9607(a)(3) if there is an actual or threatened release of such hazardous substances into the environment.**
>
> The location where a party arranged for disposal or disposed of hazardous substances is not controlling for purposes of assessing whether CERCLA is being applied extraterritorially, because CERCLA imposes liability for releases or threatened releases of hazardous substances, and not merely for disposal or arranging for disposal of such substances. **Because the actual or threatened release of hazardous substances triggers CERCLA liability, and because the actual or threatened release here, <u>the leaching of hazardous substances from slag that settled at the Site</u>, took place in the United States, this case involves a domestic application of CERCLA.**

*Pakootas v. Teck Cominco Metals, Ltd.*, 452 F.3d 1066,1077-78 (9th Cir. 2006).

Based on the foregoing, the court must conclude the relevant "happening" is the actual or threatened releases of hazardous substances from slag ("in both liquid and solid form"[2]) that settled in the UCR Site in the United States.[3] The relevant

---

[2] *Pakootas*, 452 F.3d at 1069.

[3] There is debate whether slag itself is a "hazardous substance." Assuming it is, CERCLA liability still hinges on whether a "release" occurred in the United

**ORDER RE SUMMARY JUDGMENT MOTIONS**
**RE QUALIFIED POLLUTION EXCLUSION CLAUSE- 8**

"happening" is actual or threatened releases that occurred in the United States because it is these releases which give rise to potential liability under CERCLA, not the disposal which occurred at the Trail smelter in Canada.[4]  In order for Teck to avoid the exclusion in the qualified pollution exclusion clause, Teck will have to establish that these releases were "unintended and unexpected."  That said, the court is not willing, at this time, to declare that Teck's "disposal" of slag into the river at its Canadian smelter is wholly irrelevant to the issue of whether Teck did not intend or expect "releases" of hazardous substances from the slag once it settled in the UCR site in the United States.[5]   Obviously, if the slag had not first been disposed of in the river at the Trail smelter, it would not have come to settle in the UCR site in the United States.  Although the initial disposal of the slag is not the liability-creating event ("the happening"), it may have potential relevance to the liability-creating event which is the subsequent leaching of hazardous substances from the slag after it arrived at the UCR site in the United States.  The

---

States, not on the fact the slag was disposed of into the Columbia River at Trail, B.C..  And in order to avoid the exclusion, Teck will have to establish that it did not expect or intend that the slag itself would "contaminate" the UCR and give rise to potential liability under CERCLA.

[4]  "It is the Canadian equivalent of RCRA [Resource Conservation and Recovery Act,  42 U.S.C. §§ 6901-6992k], not CERCLA, that regulates how Teck disposes of its waste within Canada."  *Pakootas*, 452 F.3d at 1078.

[5]  Under CERCLA, "release" is defined as "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or **disposing** into the environment . . . ."  42 U.S.C. Section 9601(22).  (Emphasis added).  The definition of release includes "disposing."  CERCLA defines disposal by reference to RCRA's definition of "disposal" at 42 U.S.C. Section 6903(3).  See *Pakootas*, 452 F.3d at 1078, n. 17.  There may be circumstances in which a "release" is indistinguishable from a "disposal."

**ORDER RE SUMMARY JUDGMENT MOTIONS**
**RE QUALIFIED POLLUTION EXCLUSION CLAUSE- 9**

parties should keep this in mind as discovery proceeds in this matter.

### III. CONCLUSION

The court finds as a matter of law that there is no actual conflict of law between B.C. and Washington regarding interpretation of the term "sudden" in the particular qualified pollution exclusion clause at issue in the LMI policies and therefore, that Washington law applies.  Under Washington law, the term "sudden" is considered ambiguous and therefore, does not necessarily include a temporal element.  LMI is not, however, precluded from subsequently presenting this court with newly discovered relevant extrinsic evidence which they contend shows the parties mutually understood, pursuant to actual mutual negotiations, that the term "sudden" has a temporal meaning.

The court finds as a matter of law that the relevant "happening" for the purpose of determining whether or not the exclusion applies is the release of contaminants from slag coming to rest in the UCR Site in the United States.  This is the liability-creating event under CERCLA for which Teck seeks coverage under the policies.  Assuming the term "sudden" does not include a temporal element, what remains to be determined is if Teck intended or expected that said contaminants would be released from the slag once it came to rest in the United States.

Plaintiff's Motion For Summary Judgment On The Qualified Pollution Exclusion (Ct. Rec. 382) is **GRANTED** to the extent set forth above. Defendants' Cross-Motion For Summary Judgment On The Qualified Pollution Exclusion (Ct. Rec. 424) is **DENIED**.  Plaintiff's Motion To Strike London Insurers' Reply On

**ORDER RE SUMMARY JUDGMENT MOTIONS
RE QUALIFIED POLLUTION EXCLUSION CLAUSE- 10**

The Qualified Pollution Exclusion (Ct. Rec. 465) is **DENIED** as moot.[6]

**IT IS SO ORDERED.**  The District Court Executive is directed to enter this order and to provide copies to counsel of record.

**DATED** this  9th  day of August, 2010.

_s/ Lonny R. Suko_
LONNY R. SUKO
Chief United States District Court Judge

---

[6]Defendants' request for a Fed. R. Civ. P. 56(f) continuance is **DENIED** as moot in that additional discovery is not necessary to resolve the issues which have been resolved as a matter of law.

**ORDER RE SUMMARY JUDGMENT MOTIONS**
**RE QUALIFIED POLLUTION EXCLUSION CLAUSE- 11**