1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

8  TECK METALS, LTD.,

9               Plaintiff,

10

11      vs.

12

13  CERTAIN UNDERWRITERS AT
    LLOYD'S, LONDON AND
14  CERTAIN LONDON MARKET
    INSURANCE COMPANIES,

15              Defendants.

16

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. CV-05-411-LRS

**ORDER RE MOTION
FOR RECONSIDERATION
AND/OR CLARIFICATION**

17      **BEFORE THE COURT** is the Defendants' Motion For Reconsideration

18  And/Or Clarification (Ct. Rec. 536).  At its discretion, the court has decided this

19  motion without oral argument.  LR 7.1(h)(3)b.v.

20

21  **I. RECONSIDERATION**

22      A Fed. R. Civ. P. 59(e) motion for reconsideration can only be granted when

23  a district court: (1) is presented with newly discovered evidence; or (2) committed

24  clear error or the initial decision was manifestly unjust; or (3) there has been an

25  intervening change in controlling law.  *Dixon v. Wallowa County*, 336 F.3d 1013,

26  1022 (9th Cir. 2003).

27  **ORDER RE MOTION FOR
28  RECONSIDERATION AND/OR CLARIFICATION- 1**

1

**A.  Extrinsic Evidence**

2       In its August 10, 2010 "Order Re Summary Judgment Motions Re Qualified

3   Pollution Exclusion Clause" (Ct. Rec. 516), this court found as a matter of law that

4   there is no conflict between B.C. law and Washington law and therefore,

5   Washington law applies which holds that on its face, the term "sudden" in the

6   qualified pollution exclusion clause at issue here is ambiguous and as such, does

7   not contain a temporal element distinct from the terms "unexpected and

8   unintended."  *Queen City Farms, Inc. v. Central National Insurance Company of*

9   *Omaha*, 126 Wn. 2d 50, 82, 882 P.2d 703 (1994).  This court also recognized,

10  however, that extrinsic evidence could potentially resolve the ambiguity and

11  establish that the parties mutually understood the term to mean temporal

12  abruptness.  This court found the extrinsic evidence offered by LMI related only to

13  Teck's unilateral or subjective purposes and intentions regarding the term

14  "sudden" and under Washington law, was insufficient to resolve the ambiguity.

15  This court held that "what is necessary is . . . extrinsic evidence of the parties'

16  mutual intent which, in the insurance context, arises from actual mutual

17  negotiations that took place between them" and LMI had not yet presented such

18  evidence.

19       LMI contend the court erred in so holding because the Washington Supreme

20  Court in *Lynott v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 123 Wn. 2d

21  678, 871 P.2d 146 (1994), did not purport to hold that extrinsic evidence is always

22  inadmissible to interpret a term that was not specifically negotiated.  According to

23  LMI, even if the parties did not negotiate the term "sudden," if there is extrinsic

24  evidence establishing they nonetheless both mutually understood the term to mean

25  temporal abruptness, that is how the term should be interpreted.

26       Under the "context rule," the intent of contracting parties cannot be

27  **ORDER RE MOTION FOR**
28  **RECONSIDERATION AND/OR CLARIFICATION- 2**

determined without examining the context surrounding the execution of an instrument. *Hearst Communications, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 502, 115 P.3d 262 (2005). If relevant for determining mutual intent, extrinsic evidence may include: (1) the subject matter and objective of the contract; (2) all the circumstances surrounding the making of the contract; (3) the subsequent acts and conduct of the parties; and (4) the reasonableness of respective interpretations urged by the parties. *Id.*, citing *Berg v. Hudesman*, 115 Wn.2d 657, 667, 801 P.2d 222 (1990). See also *Tanner Electric Cooperative v. Puget Sound Power & Light Company*, 128 Wn.2d 656, 674, 911 P.2d 1301 (1996). Surrounding circumstances and other extrinsic evidence are to be used "to determine the meaning of specific words and terms used" and not to "show an intention independent of the instrument" or to "vary, contradict, or modify the written word." *Id.* at 503, quoting *Hollis v. Garwall, Inc.*, 137 Wn. 2d 683, 695-96, 974 P.2d 836 (1999). Thus, admissible extrinsic evidence does not include evidence of a party's unilateral or subjective intent as to a contract's meaning. *Go2Net, Inc. v. C I Host, Inc.*, 115 Wn.App. 73, 60 P.3d 1245 (2003). Washington follows the objective manifestation theory of contracts pursuant to which an attempt is made to determine the intent of the parties by "focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties." *Hearst*, 154 Wn.2d at 503. Mutual intent may be established directly or by inference, but any inference must be based exclusively on the parties' objective manifestations. *Go2Net*, 115 Wn.App. at 85.

In *Queen City Farms*, the Washington Supreme Court observed that ambiguity in an insurance contract (policy) may be resolved through extrinsic evidence as to the parties' intent, but there was no such evidence in the record in that case. 126 Wn.2d at 82. The court added that "[m]oreover, while evidence of

**ORDER RE MOTION FOR
RECONSIDERATION AND/OR CLARIFICATION- 3**

the parties' mutual intent may be helpful in some contexts, we have recognized that sometimes language in standard policies does not involve mutual negotiations between the insurers and the insureds." *Id*.  Left with an ambiguity in a non-negotiated standard form insurance provision, the court construed the ambiguity in the pollution exclusion against the drafter-insurer, and in accord with a reasonable interpretation of the policy. *Id*. at 83.  The court then went on to consider the reasonableness of the interpretation offered by Queen City Farms in resolving the ambiguity and concluded that "sudden" means "unexpected" in the context of CGL policies containing the qualified pollution exclusion and therefore, "sudden and accidental" means "unexpected and unintended." *Id*. at 83-92.  It appears that although the *Queen City Farms* court concluded there was no extrinsic evidence in the record, the reasonableness of the interpretation urged by Queen City Farms was relevant extrinsic evidence of mutual intent considered by the court.  In sum, this court concludes that it read *Queen City Farms* too narrowly as holding that in the insurance policy context, evidence of the parties' mutual intent is not helpful in the absence of actual mutual negotiations between the insurer and the insured.[1]

That said, the court is still not persuaded the extrinsic evidence relied upon by LMI thus far (that cited in its June 23 reply brief, Ct. Rec. 455 at pp. 5-11) is relevant evidence of an objective manifestation of the parties' mutual intent with regard to interpretation of the term "sudden" in the pollution exclusion clause.  It may still at best constitute Teck's "[u]nilateral **or** subjective purposes and

---

[1]  Further review of *Lynott* indicates the court there considered other asserted and possible "objective manifestations" of mutual intent beyond the discussions between the insurance company's underwriter and an officer of the insurance broker.  123 Wn.2d at 688-89.  The court found, however, that none of this other extrinsic evidence was relevant to show mutual intent.

**ORDER RE MOTION FOR
RECONSIDERATION AND/OR CLARIFICATION- 4**

intentions" about the meaning of the term "sudden." *Lynott*, 123 Wn.2d at 684
(emphasis added). Intent is determined by the objective manifestations of the
agreement rather than subjective intent of either party. *Max L. Wells Trust by
Hornung v. Grand Cent. Sauna & Hot Tub Co. of Seattle*, 62 Wn.App. 593, 602,
815 P.2d 284 (1991). Although LMI assert it was their understanding at the time
of contracting with Teck that the term "sudden" meant temporally abrupt, it does
not appear LMI have presented any extrinsic evidence establishing this was LMIs'
understanding. Thus far, it appears LMI have relied solely on the language of the
pollution exclusion clause and certain exchanges between Teck and Teck's
insurance broker. In addition to there being no extrinsic evidence indicating
negotiation of the term between Teck and LMI, there is no evidence of any
discussion or correspondence between them regarding the term "sudden" at the
time of contracting.[2]

     Discovery has occurred since this court issued its summary judgment order
on August 10, and discovery continues to take place. There may be additional
extrinsic evidence for the court's consideration. Furthermore, the court will not, at

---

[2]At this juncture, the court is not certain that separate subjective
understandings by each party as to the term "sudden," even if the understandings
are the same, would constitute relevant extrinsic evidence of an objective
manifestation of mutual intent by the parties as to the meaning of the term. The
unpublished decision of the Washington Court of Appeals in *Olympic Pipe Line
Company v. Pacific Employers Insurance Company*, 2005 WL 1406125 (Wash.
App. Div. 1 2005) is without precedential value per RCW 2.06.040. If it is
without precedential value to Washington courts regarding application of
Washington law, it is of no precedential value to this federal court in applying
Washington law. Indeed, per this court's Local Rules, LR 7.1(g)(2), the decision
should not have been cited because it was filed prior to January 1, 2007.

**ORDER RE MOTION FOR
RECONSIDERATION AND/OR CLARIFICATION- 5**

this time, make a final ruling on the relevancy of the existing extrinsic evidence.[3] The parties may file dispositive motions regarding the relevance of any and all extrinsic evidence developed regarding the meaning of the term "sudden."  It is possible that determination will have to be made during trial if it cannot be made as a matter of law at summary judgment because relevant extrinsic evidence offered does not allow for the drawing of only one reasonable inference with regard to interpretation of the term "sudden." *Tanner*, 128 Wn.2d at 674.

The court reconsiders and modifies its summary judgment ruling to the extent that relevant extrinsic evidence is not limited to evidence of actual mutual negotiation of the term "sudden" in the pollution exclusion clause.

### B.  Relevant Happening

Defendants contend it is too early for the court to rule as a matter of law, as it did in its "Order Re Summary Judgment Motions Re Qualified Pollution Exclusion Clause," that the relevant "happening" under the terms of the policies is "the actual or threatened releases of hazardous substances from slag ('in both liquid and solid form') that settled in the UCR Site in the United States."  (Ct. Rec. 516 at p. 8).  At the outset, the court notes this seems at odds with Defendants' position, expressed in their cross-motion for summary judgment, that the court should find as a matter of law the relevant "happening" was the initial discharge from the Trail smelter, that this was not "unintended or unexpected," and therefore that the pollution exclusion clause applies.

The plain language of the policies indicates the relevant "happening" is one

---

[3] Because the evidence was presented for the first time in LMIs' reply brief, Teck did not have an opportunity to address it in its own written brief.

**ORDER RE MOTION FOR
RECONSIDERATION AND/OR CLARIFICATION- 6**

1    which gives rise to liability.  The underlying case, *Pakootas*, is a CERCLA case.

2    The court acknowledges that Teck's CERCLA actual liability, as imposed by the

3    law, has yet to be established and that is why in its order, it spoke only in terms of

4    "potential" liability.  (Ct. Rec. 516 at pp. 7-10).  Nonetheless, the Ninth Circuit's

5    decision in *Pakootas v. Teck Cominco Metals, Ltd.*, 452 F.3d 1066 (9th Cir. 2006),

6    clearly establishes the boundaries of any actual CERCLA liability on the part of

7    Teck.  There must be a release or threatened release of hazardous substances

8    within the United States in order to give rise to such liability.  *Id*. at 1077.

9    "Arranging for disposal of such substances, in and of itself, does not trigger

10    CERCLA liability, nor does actual disposal of hazardous substances." *Id*.  By

11    itself, the disposal of hazardous substances at the Trail Smelter, does not create

12    CERCLA liability and therefore, by itself, cannot be the relevant "happening"

13    under the policies which results in liability.  As this court stated in its order,

14    however, the disposal nonetheless has potential relevance to whether the

15    "happening" resulting in liability (the release or threatened release of hazardous

16    substances) was "unintended and unexpected."  (Ct. Rec. 516 at pp. 9-10).

17        Additional discovery and investigation will not alter what constitutes the

18    relevant "happening."  Additional discovery and investigation will assist in

19    answering what was "unintended and unexpected" on the part of Teck.  This court

20    did not clearly err in ruling as a matter of law that the relevant "happening" under

21    the terms of the policies is "the actual or threatened releases of hazardous

22    substances from slag ('in both liquid and solid form') that settled in the UCR Site

23    in the United States."  Furthermore, the court did not clearly err in denying

24    Defendants' request for a Rule 56(f) continuance with regard to this particular

25    issue.

26

27    **ORDER RE MOTION FOR**

28    **RECONSIDERATION AND/OR CLARIFICATION- 7**

1

### C. Denial Of Rule 56(f) Continuance

2    This court did not clearly err, or cause a manifest injustice to Defendants, in

3    declining to stay ruling on Plaintiff's motions for summary judgment pending

4    completion of additional discovery.  All of this court's summary judgment rulings

5    were based either on pure questions of law (i.e., existence of conflict between B.C.

6    law and Washington law), and/or on undisputed language in the policies, and/or

7    other undisputed documentary evidence, and/or prior court orders.  That the issues

8    the court resolved as a matter of law were ripe for resolution is confirmed by the

9    fact Defendants also moved for summary judgment on each of those issues.

10    Defendants assert ongoing discovery is "virtually certain to result in

11    evidence that is highly relevant to 'damages,' scope of coverage and choice of law

12    issues."  Although this court appropriately found as a matter of law, based on

13    undisputed language in the policies, that an "all sums" approach governs the scope

14    of coverage, it recognized application of that approach remains to be resolved.

15    Discovery may be helpful in that regard.  Defendants assert they anticipate taking

16    depositions that "likely will shed light on the parties' expectations as to which

17    country's laws would apply to the insurance contracts."  Even assuming such

18    evidence is developed, it has no potential for altering the court's threshold

19    determination that there is no conflict between B.C. law and Washington law on

20    scope of coverage and interpretation of the qualified pollution exclusion clause.

21    The parties' expectations are relevant to a choice of law analysis and there is no

22    choice of law issue when there is no conflict in the first instance.  This court

23    appropriately found as a matter of law that the RI/FS costs fall within the meaning

24    of "damages" contained in the policies.  Whether Defendants have a duty to

25    indemnify Plaintiff under the terms of the policies remains an open question as to

26    which discovery will presumably shed some light.  The damages which are in fact

27
28    **ORDER RE MOTION FOR**
      **RECONSIDERATION AND/OR CLARIFICATION- 8**

1    recoverable remains very much an issue.

2

3    **II.  CLARIFICATION**

4        **A.  Choice of Law**

5        The court sees no need to clarify its choice of law analysis.  It provided a

6    full ten page analysis in its "Order Re Summary Judgment Motions Re Scope Of

7    Coverage" (Ct. Rec. 515 at pp. 15-25) and adequately addressed the factors set

8    forth in the Restatement §§ 6 and 188.  That analysis also applies to interpretation

9    of the qualified pollution exclusion clause.

10

11        **B.  Existence Of Conflict Of Law**

12        As the court stated in its summary judgment orders re scope of coverage and

13    the qualified pollution exclusion clause, in order to find there is a conflict between

14    B.C. law and Washington law, there must be "sufficient proof to establish with

15    reasonable certainty the substance of foreign principles of law."  (Ct. Rec. 515 at

16    p. 5; Ct. Rec. 516 at pp. 2-3).  Although this court pointed out the absence of any

17    authoritative binding decisions in B.C., or Canada as a whole, regarding scope of

18    coverage and the qualified pollution exclusion clause, it also specifically found it

19    was not "reasonably certain" a B.C. court or the Supreme Court of Canada would

20    arrive at conclusions on those issues which conflict with Washington law.  (Ct.

21    Rec. 515 at p. 14; Ct. Rec. 516 at p. 4).  This court did not employ an "absolute

22    certainty" standard.  Had it done so, it would have been unnecessary to devote a

23    cumulative thirteen pages to analyzing whether there was a conflict of law (Ct.

24    Rec. 515 at pp. 4-14; Ct. Rec. 516 at pp. 2-4).

25

26

27    **ORDER RE MOTION FOR**

28    **RECONSIDERATION AND/OR CLARIFICATION- 9**

1

### C.  Risk In The Upper Columbia River

2      The LMI policies provide coverage for multiple locations of risk, including

3   the Upper Columbia River (UCR) in Washington.  This finding was made in

4   conjunction with the court's choice of law analysis and specifically, its

5   consideration of the reasonable expectation of the parties as to whether

6   Washington law might apply to interpretation of the policies.  Obviously, whether

7   there is actual coverage for damages incurred by Teck at that location of risk is a

8   question to be resolved at a later date.

9

### D.  Wrongful Action

11      LMI noted that the Supreme Court of Canada, in affirming denial of Teck's

12   application to have British Columbia courts decline jurisdiction over this

13   insurance coverage dispute, reasoned that "Teck's alleged wrongful actions

14   occurred solely in Canada . . . ."  This court concluded the U.S. Court of Appeals

15   for the Ninth Circuit had "effectively found" to the contrary that "Teck's alleged

16   wrongful actions occurred in the United States by virtue of hazardous elements

17   being released from slag discharged by Teck in Trail, B.C., and coming to rest

18   within the UCR in the United States."  (Ct. Rec. 515 at pp. 15-16).  In its choice of

19   law analysis, this court concluded "[a]s legitimate an expectation by the insured,

20   and the insurers for that matter, is that Washington law might apply to policies

21   insuring risk worldwide where the alleged wrongful action and the alleged damage

22   occurred in Washington, only a few miles from the Trail smelting operation."  (Ct.

23   Rec. 515 at pp. 24-25).

24      LMI assert the Ninth Circuit used the alleged "release" in Washington as a

25   jurisdictional hook for CERCLA liability, but did not suggest the alleged "release"

26   involved any "wrongful action" by Teck within Washington.  Even assuming there

27

28

**ORDER RE MOTION FOR
RECONSIDERATION AND/OR CLARIFICATION- 10**

1  was no "wrongful action" by Teck within Washington, this would not alter the

2  court's choice of law analysis since there is no question the alleged damage

3  occurred in Washington.  Therefore, it was foreseeable that Teck would face

4  potential liability in Washington and the parties could reasonably expect that

5  Washington law might apply to interpretation of the insurance policies.   As

6  Teck's CERCLA liability, as imposed by the law, has yet to be determined, it

7  remains possible Teck may yet be found to have engaged in some "wrongful

8  action" in Washington.

9

10       **E.  *Canron***

11       In its choice of law analysis in its "Order Re Motions For Summary

12  Judgment Re Scope Of Coverage," this court noted with regard to the *Canron*

13  decision by the Washington Court of Appeals:

14            In *Canron*, the court concluded "British Columbia would
             best be considered the location of the subject matter in relation
15            to this case," even though the contaminated site at issue was in
             Kent, Washington.  Thus, the argument can be made in the instant
16            case that "the location of the subject matter" is Teck's smelting
             operation in Trail, B.C.  That argument would carry more heft if the
17            Ninth Circuit had agreed with Judge McDonald that the "releases" at
             issue were from the Trail plant and that an extraterritorial application
18            of CERCLA was necessary and permissible.  The Ninth Circuit did
             not agree.  It found the "releases" occurred in Washington in the
19            Upper Columbia River site when harmful elements were released
             from slag which had been discharged from the Trail plant and
20            eventually settled in the Upper Columbia River site.

21  (Ct. Rec. 515 at p. 23).

22       Defendants contend *Canron* is indistinguishable from the case at bar

23  because *Canron* also involved a CERCLA-defined "release" within Washington,

24  but the Washington Court of Appeals still held that British Columbia would best

25  be considered the location of the subject matter of the insurance contracts.

26  According to the *Canron* court: "[T]he parties understood the contracts covered

27
    **ORDER RE MOTION FOR**
28  **RECONSIDERATION AND/OR CLARIFICATION- 11**

multiple risks in multiple locations, including the galvanizing plant in British Columbia. The plant's wastes were shipped from British Columbia. British Columbia would best be considered the location of the subject matter **in relation to this case** . . . ." 82 Wn.App. at 493-94 (emphasis added).

The *Canron* court apparently considered the B.C. galvanizing plant in that case to be the subject matter of the insurance contracts, although it must be noted it did not have to make such a ruling because neither of the parties argued for the application of B.C. law. *Id*. at 494. This court is aware of no authority dictating that the location of the "subject matter" of an insurance contract must necessarily be the physical plant that initially created the hazardous waste itself, or that initially created the substance that eventually caused the release of hazardous waste. To this court, it makes just as much sense to conclude the "subject matter" is the risk and the alleged pollution damage which give rise to the particular liability at issue and for which insurance coverage is claimed. Here, the location of the risk and the alleged damage is the UCR Site in Washington. It is the "release" of hazardous substances which gives rise to potential CERCLA liability on the part of Teck and for which it seeks insurance coverage. As this court noted, the LMI policies insure multiple principal locations of risk and indeed, provide worldwide coverage. (Ct. Rec. 515 at pp. 18-19; 22). As this court also noted, the location of the "subject matter" is but one factor in the choice of law analysis and indeed, notwithstanding its finding that the B.C. galvanizing plant constituted the location of the "subject matter" in *Canron*, the Washington Court of Appeals concluded Washington law applied because it had "a paramount interest in the health and safety of its people." 82 Wn.App. at 494.

**ORDER RE MOTION FOR RECONSIDERATION AND/OR CLARIFICATION- 12**

**F.  Washington's Interest**

The purpose of the RI/FS is to investigate the extent of the contamination at the UCR Site and to determine what is the best remedy for cleaning up the same. Under CERCLA, the investigation is a prerequisite to remediation.  They are part and parcel of the same process.  Thus, as in *Canron*:

> Washington bears the responsibility under CERCLA for ensuring the site cleanup and will bear the burden if the site is not cleaned.  The existence or absence of insurance proceeds can determine whether or not a hazardous waste site is remediated. Washington, therefore, has a significant interest in [Teck's] insurance coverage.

*Id*. at 494.

**G.  Location Of The Contaminated Site**

Defendants contend that for all intents and purposes, this court found the location of the contaminated site (Washington) controls the outcome of the choice of law analysis.  Defendants assert the court unfairly gave more weight to the location of the contaminated site "and less weight to other important factors such as the fact that the subject matter of the risk (the Trail smelter) which is alleged to be the primary source of contamination, is located in British Columbia."  This court did not find that the "subject matter of the risk" is the Trail Smelter.  It found the "subject matter of the risk" is the release of hazardous substances from slag located in the UCR Site.  (Ct. Rec. 515 at p. 23; and discussion *supra* regarding *Canron*).  And while the court noted this is "first and foremost an insurance coverage dispute between the parties" and the "'performance' at issue is the performance of insurance contract obligations," it also noted that the "location of the subject matter of the policies extends beyond B.C. and includes sites in Washington and elsewhere."  (*Id*. at p. 24).  Although the majority of Teck's

**ORDER RE MOTION FOR RECONSIDERATION AND/OR CLARIFICATION- 13**

1  operations are in B.C., "it was understood by Teck and LMI that those operations

2  created risks of liability beyond the borders of B.C. and thus, the policies were

3  created to cover those risks." (*Id.*). Even though this court found there is no

4  conflict between B.C. law and Washington law, it engaged in a choice of law

5  analysis. This court considered all of the factors relevant to that analysis and

6  concluded they weighed in favor of applying Washington law.

7

8          **H. RI/FS Costs Unrelated To "Releases" From Slag**

9          LMI ask the court to clarify it has not ruled that RI/FS costs related to non-

10  slag contamination, if any, are "damages" under the policies, considering the court

11  concluded the relevant "happening" is "the actual or threatened releases of

12  hazardous substances from slag ("in both liquid and solid form") that settled in the

13  UCR Site in the United States." The court found this to be the relevant

14  "happening" because it is these releases which give rise to potential liability under

15  CERCLA.

16          This is not an issue which was specifically presented to the court on

17  summary judgment. The court's relevant "happening" determination occurred in

18  conjunction with its ruling on the summary judgment motions related to the

19  qualified pollution exclusion clause. (Ct. Rec. 516 at pp. 8-9). In a separate order,

20  the court ruled as a matter of law that RI/FS costs incurred by Teck pursuant to its

21  Settlement Agreement with EPA constitute "damages" as that term is used in the

22  policies. This court found Teck has a legal obligation to pay RI/FS costs by

23  reason of liability assumed under the EPA Settlement Agreement for a property

24  damage claim (as opposed to liability imposed by law). Teck acknowledged it was

25  not requesting a ruling that LMI have a present duty to indemnify Teck, and this

26  court made no ruling with regard to indemnification. (Ct. Rec. 517 at p. 13). The

27  **ORDER RE MOTION FOR**

28  **RECONSIDERATION AND/OR CLARIFICATION- 14**

1    duty to indemnify hinges on the insured's actual liability to the claimant and actual

2    coverage under the policy.  *Hayden v. Mut. of Enumclaw Ins. Co.*, 141 Wn.2d 55,

3    64, 1 P.3d 1167 (2000).  While Teck's liability for RI/FS costs has been

4    established pursuant to the EPA Settlement Agreement, this court has not relieved

5    Teck of its burden to demonstrate coverage.  Accordingly, whether the RI/FS costs

6    for which Teck has assumed liability under the EPA Settlement Agreement are

7    covered under the LMI policies and therefore, subject to indemnification, will be

8    resolved at a later date.[4]

_____

18        [4]  In its "Order Re Summary Judgment Motions Re Environmental Response
19   Costs As 'Damages'," in the section addressing whether RI/FS costs are "on
     account" of "property damage," (Ct. Rec. 517 at p. 11), this court noted:

21        "Property Damage" must be "caused by or aris[e] out of each occurrence
          happening anywhere in the world."  Teck acknowledges that whether
22        there has been an "occurrence" is a question for a later time and is not
          something it seeks to resolve now on summary judgment.  Whether there
23        was a qualifying "occurrence" depends on whether there was a "happening"
          which "unexpectedly and unintentionally" resulted in property damage.
24        The question for future resolution is whether, assuming there was property
          damage, Teck did not expect or intend the same to occur from any activity
25        for which it is responsible.

**ORDER RE MOTION FOR
RECONSIDERATION AND/OR CLARIFICATION- 15**

1    **III.  CONCLUSION**

2         Defendants' Motion For Reconsideration And/Or Clarification (Ct. Rec.

3    536) is **GRANTED in part** and **DENIED in part** as set forth above.

4         **IT IS SO ORDERED**.  The District Executive is directed to enter this order

5    and forward copies to counsel.

6         **DATED** this ___22nd___ of October, 2010.

7

8                              *s/Lonny R. Suko*

9                         ─────────────────────────
                              LONNY R. SUKO
10                         Chief United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27   **ORDER RE MOTION FOR**

28   **RECONSIDERATION AND/OR CLARIFICATION- 16**