Gabriel Baker, WSBA No. 28473
Benjamin J. Roesch, WSBA No. 39960
Jennifer K. Smith, WSBA No. 41929
LANE POWELL PC
1420 Fifth Avenue, Suite 4100
Seattle, Washington 98101-2338
Telephone: 206.223.7000
Facsimile: 206.223.7107

HONORABLE LONNY R. SUKO

Attorneys for Defendants,
London Market Insurers

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WASHINGTON
# AT SPOKANE

| | |
|---|---|
| TECK METALS, LTD., <br><br>  Plaintiff, <br><br> v. <br><br> CERTAIN UNDERWRITERS AT LLOYD'S, LONDON AND CERTAIN LONDON MARKET INSURANCE COMPANIES, <br><br>  Defendants. | Case No.: CV-05-411-LRS <br><br> **DECLARATION OF PETER S. WILSON IN SUPPORT OF DEFENDANTS LONDON MARKET INSURERS' OPPOSITIONS TO TECK'S MOTIONS FOR SUMMARY JUDGMENT** |

I, Peter S. Wilson, declare as follows:

1. As set forth in my Expert Report, which I submitted in the above-captioned litigation and which is attached hereto as Exhibit 1, I have worked in the London insurance market for over 40 years. I worked as a Lloyd's broker, although most of my professional experience was as a London company underwriter. I have extensive experience broking and underwriting various types of policies issued to insureds in North America and Canada and in particular excess comprehensive general third party liability and umbrella policies which sit excess of specified underlying policies or self insured retentions. My experience also includes the handling of claims for such policies and further includes acting as a consultant with regard to policy coverage disputes for both insurers and policyholders.

DECLARATION OF PETER WILSON
CV-05-411-LRS—1

2. I am 69 years of age and am a resident of Ditchling, Sussex, England.

3. After completing my studies at Whitgift School (equivalent of a USA High School), I joined Price Forbes and Company, a firm of London broker, in 1958. On commencing my employment, I was assigned to the North American Department, which was responsible for placing insurance coverage on behalf of policyholders domiciled in the United States of America and Canada. After completing an initial training period I was transferred to the department's division that handled third party personal injury and property damage coverage and in particular policies issued using an umbrella wording.

4. In September 1959, I was appointed to the position of a Junior Placing Broker handling North American liability risks and remained in that position for approximately two years. I was then appointed to the position of Senior Placing Broker, also handling North American liability risks and my additional duties included negotiating with the "Leading" Underwriters in the London Insurance Market and entering into the bargaining negotiations to secure satisfactory premium terms and coverage conditions on behalf of our clients, the Insureds. During my tenure as a broker I had dealings with underwriters in both the Lloyd's Market and also the London Company Market (hereinafter collectively "the London Market").

5. In April 1963, I joined H S Weavers (Underwriting) Agencies Limited (Weavers) who acted as underwriting agents for various insurance companies. My first position in 1963 was that of an Assistant Underwriter until 1967 when I was promoted to a full underwriting position, known as a Senior Underwriter. At that time I was also appointed to the Board of Directors. During the period 1963 until 1966 I was also directly responsible for any claims under the policies underwritten by Weavers. In 1966, I appointed a Claims Manager and he and subsequent Claims Managers reported to me on a daily basis. In 1974 I became the Chief Underwriter and the Managing Director of the Company. As Chief Underwriter I was responsible for deciding the types and classes of insurance and reinsurance risks to be underwritten by

DECLARATION OF PETER WILSON
CV-05-411-LRS—2

Weavers. In addition to underwriting risks myself on a daily basis, I also monitored the underwriting activities of my Senior and Assistant underwriters. In September 1989, I was appointed Deputy Chairman of the Board of Directors, in addition to my role as Chief Underwriter, a position I held until I left Weavers in 1990.

6. Between the mid 1970's and 1990 I also served on the Boards of Directors for various insurance and reinsurance companies and underwriting agencies, brokers and an insurance consultant domiciled in the United Kingdom, Bermuda, and the United States of America.

7. Since June of 1990 my services have been engaged by Beresford Consultants Limited of Ditchling, Sussex, England, a consulting company I founded which specialises in insurance and reinsurance contract coverage matters for both insurers and policyholders and also reinsurers and reinsureds.

### Misrepresentation

8. As set forth in my Expert Report (Exh. 1 hereto), I am of the opinion that Cominco, Ltd. ("Cominco") and/or its brokers failed to disclose to London Market Insurers information that would have been material to London Market Insurers in underwriting the policies to Cominco.

9. I have explained in my Expert Report that Cominco and/or its brokers failed to include information relating to Cominco's environmental exposures. For example, Cominco's environmental manager, E.N. Doyle, expressed serious concerns about Cominco's environmental exposures to Cominco's Risk Manager, D. A. MacCulloch, in 1981 after reading the Report on Application for Environmental Impairment and Liability Insurance prepared by Geoffrey T.G. Scott ("Scott Report"), stating:

> "I agree with Scott's comments concerning mercury. There is no question in my mind that this is the single most vulnerable area that Cominco may have to face up to if the Americans ever find time and money to do exhaustive research on lake sediments in FDR Lake between the dam and the head waters."

DECLARATION OF PETER WILSON
CV-05-411-LRS–3

...

Mr. Doyle also stated in his letter that:

> "In Section 8.13, there is no question that we are at risk in terms of the deposition of heavy metals that has taken place over the last 70 to 80 years."

*See* Exh. 1 at 23-24.

10. As set forth in my Expert Report, based on my review of the letter and the Scott Report and based upon my years of experience as a broker and underwriter in the London Market, it is my opinion that Cominco's views about its "single most vulnerable area" as to its environmental exposures would have been material to Underwriters. However, this information was not disclosed to London Market Insurers.

11. Additionally, Cominco did not disclose to London Market Insurers the conclusions of the Scott Report itself, which was a report that Cominco specifically commissioned to assess its environmental exposures. As explained in my Expert Report, the Scott Report raised serious concerns about Cominco's known and expected seepage, pollution and contamination exposures. *See* Exh. 1 at 23. Based on my years of experience broking and underwriting insurance in the London Market and the customs and practices within the market, the conclusions in the Scott Report about Cominco's environmental exposures would have been material to the underwriters subscribing to the London policies at issue in this lawsuit. Furthermore, as discussed in my Export Report, based on my review of the transcript of the deposition of Peter Smith, who was Cominco's Coordinator of Risk and Insurance, it is also the case that Cominco fully appreciated that the conclusions of the Scott Report were material information that should have been disclosed to the underwriters subscribing to the London policies at issue in the case. *See* Exh. 1 at 24-27.

12. Since I submitted my Expert Report, I have been provided additional documents pertaining to what I understand to be claims and lawsuits asserted against Cominco stemming from horse deaths and pollution property damage caused by discharges from Cominco's Trail smelter. Specifically, I reviewed Writs filed in 1971

against Cominco where the plaintiffs alleged that discharges from Cominco's Trail smelter destroyed animals, trees, crops, grass, shrubs on the plaintiffs' properties and that the discharges posed a risk to the plaintiffs' health. True and correct copies of the Writs are attached hereto as Exhibit 2. I also reviewed documents that appear to indicate that Cominco settled those actions as well as another related claim in 1971 and paid substantial amounts well in excess of $100,000 to resolve these claims and lawsuits. True and correct copies of those documents are attached hereto as Exhibit 3.

13. Based on my review of the aforementioned documents and my opinions regarding the custom and practice within the London Market and based upon my years of experience as a broker and underwriter in the London Market, it is my firm belief and opinion that the pollution claims and lawsuits referenced above would have been material to the underwriters subscribing to the London policies at issue. This is particularly true, given the longstanding custom and practice in the London Market of the assured's duty of utmost good faith, which required the assured and its broker to disclose all information to the underwriters that was material to the risk.

14. I am also aware and have reviewed various applications purportedly relating to the insurance at issue in this case, which Teck alleges were submitted to London Market Insurers. True and correct copies of those applications which I understand Teck alleges were submitted to London Market Insurers are attached hereto as Exhibits 4-13.

15. These insurance applications are consistent with those routinely used in the London Market during the period of the policies at issue in this case.

16. The applications contain a specific request for information about losses in excess of $10,000 because such information is material to the decision whether or not to underwrite a specific risk, and if so at what premium and terms the risk would be agreed.

17. Based on my review of the applications purportedly submitted by Cominco, it does not appear to me that Cominco ever disclosed to Underwriters the

DECLARATION OF PETER WILSON
CV-05-411-LRS–5

information described above in Paragraph 11 regarding pollution claims and lawsuits against Cominco in 1971.

18. It is my opinion that had the information described in Paragraph 11 of this declaration been disclosed London Market Insurers would not have agreed to place insurance in favour of Cominco for the same or on the same terms and conditions, if at all. Had London Market Insurers received the information not disclosed to them, London Market Insurers could have chosen not to write this risk at all or limit the scope of the coverage. Since the post-1975 policies were written in the marine market, London Market Insurers also could have chosen to exclude all non-marine risks, or exclude the Trail site specifically, or impose other limitations on coverage.

19. This additional information regarding the pollution claims and lawsuits described in Paragraph 11 of this declaration apparently was produced after my Expert Report. This additional information further confirms my opinion as set forth in Paragraph 8 of this declaration that Cominco and/or its brokers failed to disclose to London Market Insurers all of the information that would have been material to London Market Insurers in underwriting the policies to Cominco.

20. It is my further opinion that Cominco's failure to disclose the information about the pollution claims and lawsuits described in Paragraph 11 of this declaration when it first procured insurance from the London Market in 1972 not only materially affected the London Market Insurers subscribing to that first policy, but also the London Market Insurers that subscribed to each and every successive London policy in favour of Cominco thereafter.

### Pollution Exclusion

21. As set forth in my Expert Report, the custom and practice in the London Market was that pollution exclusions, such as NMA 1685, would be understood to mean that any liability caused by pollution or contamination would be excluded unless

DECLARATION OF PETER WILSON
CV-05-411-LRS—6

it was caused by a "sudden, unintended, and unexpected happening during the period" of the insurance. *See* Exh. 1 at 12.

22. Underwriters and brokers involved with liability insurance in the London Market (including Cominco's London brokers) would understand "sudden" to mean abrupt or quick. It was and is my understanding today that the word "sudden" in pollution exclusions including NMA 1685, meant quick or abrupt.

23. It is for the reasons set forth in my Expert Report that I stated the following opinion:

> At the time of placing and renewing Cominco's risk with LMI, I am of the opinion that both Cominco and their producing broker, Johnson & Higgins and also their Lloyd's broker fully understood the language and purpose of the NMA 1685 Seepage, Pollution and Contamination exclusion that is contained in the policies at issue. I understand from the deposition testimony of Peter Smith taken on August 3, 2010 that Cominco recognised the restrictions imposed by NMA 1685 on a possible occurrence resulting from seepage, pollution and contamination. Consistent with Cominco's understanding that the pollution exclusion requires the cause of the seepage, pollution and contamination to be sudden, Cominco explored in late 1981 the purchase of Environmental Impairment Liability to provide for their seepage, pollution and contamination risks that were excluded in the policies issued by LMI due to the inclusion of NMA 1685. In January of 1982 Cominco received a comprehensive report from Mr. Geoffrey T. D. Scott, Consulting Engineer, on his site inspections at their various facilities which listed the company's exposures to seepage, pollution and contamination.

Exh. 1 at 13.

///
///
///
///
///
///
///

DECLARATION OF PETER WILSON
CV-05-411-LRS–7

24. If called as a witness, I could and would testify competently to the foregoing from my own personal knowledge.

I declare under penalty of perjury under the laws of the State of Washington and the United States of America that the foregoing is true and correct.

Dated this 21st day of February 2011, at DITCHLING, England.

Peter S. Wilson