# Exhibit 1

**EXPERT REPORT OF PETER S WILSON**

**DECEMBER 1, 2010**

**IN THE MATTER OF:**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WASHINGTON**

| | | |
|---|---|---|
| **TECK METALS LTD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | No: CV-05-411-LRS |
| | ) | |
| **CERTAIN UNDERWRITERS AT** | ) | |
| **LLOYD'S, LONDON AND CERTAIN** | ) | |
| **LONDON MARKET INSURANCE** | ) | |
| **COMPANIES** | ) | |
| **Defendants.** | ) | |

2

**1)**     **INTRODUCTION:**

1.1)     I am a consultant with the firm of Beresford Consultants Limited and have

been retained by Certain Underwriters at Lloyd's and Certain London Market

Insurance Companies, collectively London Market Insurers ("LMI") with

respect to various insurance policies subscribed to and by LMI naming

Cominco Ltd, which I understand is currently known as Teck Metals Ltd.

1.2)     Counsel for LMI have asked me to opine on the following matters in respect

of the London market policies at issue in this litigation:-

1.2.1)   The method and required procedures for a Canadian company wishing to

obtain insurance in the London market

1.2.2)   The Pollution Exclusions.

1.2.3)   The concept of the Exhaustion of Underlying Limits.

1.2.4)   The Prior Insurance and Non-Cumulation of Liability Condition.

1.2.5)   Notice of Occurrence Condition.

1.2.6)   Misrepresentation.

1.2.7)   Utmost Good Faith.

1.2.8)   Fortuity.

1.2.9)   The Service of Suit Condition.

1.3)     The contents of this Report are based on over fifty one years of experience

working in and with the London insurance market during which time I have

become very familiar with the forms of insurance used and underwritten in

the London market and also in the United States domestic market for North

American policyholders.  My experience encompasses broking and

underwriting various types of policies issued to insureds in North America

and Canada in particular excess comprehensive general third party liability

3

and umbrella policies which sit excess of specified underlying policies or self insured retentions. My experience also includes the handling of claims for such policies and further includes acting as a consultant with regard to policy coverage disputes for both insurers and policyholders.

1.4)    Beresford Consultants Limited is charging LMI for my time at our current rate of £270 per hour for work carried out in the United Kingdom and £2,500 per day for work carried out in the United States and Canada plus reimbursement of travel and hotel expenses when necessary.

## 2)    QUALIFICATIONS:

2.1)    Please refer to my CV attached to this report as **Exhibit I**

2.2)    As a result of my insurance and also re-insurance experience, I have, since the mid 1980's testified extensively as both a fact witness and expert witness at depositions, court trials, and arbitration hearings with regard to both insurance and reinsurance policy coverage disputes on behalf of insurers and re-insurers and also policyholders and re-insureds.

2.3)    I am 69 years of age and am a resident of Ditchling, Sussex, England. After completing my studies at Whitgift School (equivalent of a USA High School), I joined Price Forbes and Company, a firm of Lloyd's Brokers, in 1958. On commencing my employment, I was assigned to the North American Department, which was responsible for placing insurance coverage on behalf of policyholders domiciled in the United States of America and Canada. After completing an initial training period I was transferred to the department's division that handled third party personal injury and property damage coverage and in particular policies issued using an umbrella wording. At that time all umbrella policies were issued on the Price Forbes 1948

12

4

Umbrella Wording or subsequent revisions to the wording known as the Price Forbes 1955 or 1956 or 1959 Umbrella Wordings. Other types of manuscripted Broad Form wordings were also used for the issuance of excess third party liability policies to major corporations in the USA and in particular a wording known as the "Gulf Oil" wording. In addition certain excess liability policies were issued using the various versions of the Lloyd's TP wordings.

2.4) During my tenure at Price Forbes I was also involved with a replacement to the umbrella wordings referred to at Section 2.3) above. This was known as the LRD 1960 Umbrella Wording plus there was a wording known as the LRD 1960 Short Excess Wording for umbrella policies which were excess of the first layer of umbrella coverage.

2.5) I am fully conversant with all the wordings used by Price Forbes for the issuance of excess third party liability coverage during the mid 1940's, 1950's and 1960's.

2.6) In September 1959 I was appointed to the position of a Junior Placing Broker handling North American liability risks and remained in that position for approximately two years. I was then appointed to the position of Senior Placing Broker, also handling North American liability risks and my additional duties included negotiating with the "Leading" Underwriters in the London Insurance Market and entering into the bargaining negotiations to secure satisfactory premium terms and coverage conditions on behalf of our clients, the Insureds. During my tenure as a broker I had dealings with underwriters in both the Lloyd's Market and also the London Company Market (hereinafter collectively "the London Market").

2.7) Throughout my time at Price Forbes I became very conversant with the

5

drafting history and the terms and conditions of the Price Forbes 1948, 1955, 1956, 1959 Umbrella wordings, the LRD 1960 Umbrella Wording and the "Gulf Oil" wording.

2.8) In April 1963, I joined H S Weavers (Underwriting) Agencies Limited (Weavers) who acted as underwriting agents for various insurance companies. My first position in 1963 was that of an Assistant Underwriter until 1967 when I was promoted to a full underwriting position, known as a Senior Underwriter. At that time I was also appointed to the Board of Directors. During the period 1963 until 1966 I was also directly responsible for any claims under the policies underwritten by Weavers. In 1966 I appointed a Claims Manager and he and subsequent Claims Managers reported to me on a daily basis. In 1974 I became the Chief Underwriter and the Managing Director of the Company. As Chief Underwriter I was responsible for deciding the types and classes of insurance and reinsurance risks to be underwritten by Weavers. In addition to underwriting risks myself on a daily basis, I also monitored the underwriting activities of my Senior and Assistant underwriters. In September 1989, I was appointed Deputy Chairman of the Board of Directors, in addition to my role as Chief Underwriter, a position I held until I left Weavers in 1990.

2.9) Weavers commenced business on January 1, 1963 and was formed by Henry S. Weavers, who had previously commenced his insurance career with the firm of Lloyd's brokers, Price Forbes & Company in 1946. In the mid 1950's he subsequently joined the Merrett Non-Marine Syndicate at Lloyd's as the Deputy Underwriter to Leslie R. Dew and he assisted Mr Dew in the drafting of the LRD 1960 Umbrella Wording.

2.10) Weavers specialised in the underwriting of excess third party liability and

6

umbrella policies for North American insureds and became a recognised and

established Lead Underwriter in the London Market, in addition to

underwriting other types of non-marine insurance and reinsurance.

2.11)    Whilst at Weavers I was also involved with the drafting of the London 1971

Umbrella Wording and the 1985 Claims Made Excess Liability wording.

2.12)    Between the mid 1970's and 1990 I also served on the Boards of Directors

for various insurance and reinsurance companies and underwriting

agencies, brokers and an insurance consultant domiciled in the United

Kingdom, Bermuda, and the United States of America.

2.13)    Since June of 1990 my services have been engaged by Beresford Consultants

Limited of Ditchling, Sussex, England, a consulting company I founded

which specialises in insurance and reinsurance contract coverage matters for

both insurers and policyholders and also reinsurers and reinsureds.

2.14)    My personal training and experience in the London Market qualifies me to

opine on matters relating to the policies issued to the predecessor company of

Teck Metals Ltd and if necessary to provide rebuttal opinions to matters

addressed in the Expert Reports of John Holford and Dennis Connolly.

2.15)    I have personal knowledge of the matters referred to in this report and if

called as witness, I could and would competently testify under oath with

regard to my own knowledge thereto.

2.16)    A list of my Deposition and Trial testimony from 2006 onwards is attached at

**Exhibit II** to this report.


3)    **<u>DOCUMENTS REVIEWED:</u>**


3.1)    The policies at issue from August 29, 1972 to June 30, 1985, as attached to

the Declaration of Stephen Murray dated January 30, 2006.


15

3.2)    The transcript and attached exhibits for the Deposition of Peter Smith taken on August 3, 2010.

3.3)    London Market Insurers' Responses to Plaintiff's Second Set of Interrogatories and Third Set of Requests for Production.

3.4)    Correspondence between Cominco and their brokers, as per:-

**Bates No: MM_0000027; MM_0000139/40; MM_0000145/46; MM_0000294; MM_0003478/79; MM_0003498/99; MM_0003505; MM_0003513/14; MM_0003540/41; MM_0003556; MM_0003596; MM_003598 ; MM_0003600 to 0003603; MM_0004003; MM_0004005/6; MM_0004012 to 0004015; and MM_0004021.**

**TML0003533; TML_0005095; TML_0005098/99; TML_0005136; TML_0005157; TML_0005162/63; and TML0005167 to 0005169.**

**TECK0175614; and TECK0175630.**

**LONDON003919 to 004027; LONDON003567 to 003572; LONDON000930 to 000940; LONDON003919 to 004027; LONDON004222 to 004223; LONDON001952 to 001966; LONDON004408 to 004413; and LONDON004422.**

**TML_0014895 to 0014931; TML_0013261 to 0013268; TML_0013281 to 0013287; TML_0013546 to 0013553; TML_0013500 to 0013501; TML_0013497 to 13499; and TML_0013490 to 0013496;**

**MM_0003978 to 0003979; MM_0002550 to 0002555; MM_0002549; MM_0002533 to 0002538; MM_0000544 to 0000550; MM_0002414 to 0002425; MM_0000722 to 0000728; MM_0000710 to 0000711; MM_0000715 to 0000721; MM_0000729 to 0000787; MM0001951; MM_0000788 to 0000819; MM_0000820 to 0000856; MM_0000857 to 0000921; and MM_0000922 to 0000986.**

3.5)    London broker placing slips, as per:-

**Bates No: LONDON000376 to 000384; LONDON005523 to 005525; LONDON000573 to 000575; LONDON005573 to 005580 LONDON005583 to 005589; LONDON001510 to 001513; LONDON00592 to 00598; LONDON005523 to 005525; LONDON000573 to 000575; LONDON005573 to 005580; LONDON005583 to 005589; LONDON001510 to 001513; LONDON005592 to 005598; LONDON005600 to 005606; LONDON005618 to 005620; LONDON000835 to 000839; LONDON000885 to 000891; LONDON000903 to 000905; LONDON005634 to 005638; LONDON005658 to 005661; LONDON001009 to 001012; LONDON005676 to 005679; LONDON001052 to 001055; LONDON001159 to 001160;**

8

**LONDON001181 to 001183; LONDON001204 to 001240;
LONDON001260 to 001285; LONDON001321 to 001369;
LONDON001399 to 001409; LONDON001500 to 001505;
LONDON001791 to 001802; LONDON002072 to 002076;
LONDON002119 to 002122; LONDON001623 to 001625;
LONDON001983 to 001986; LONDON002002 to 002005;
LONDON005940 to 005942; LONDON006126 to 006129;
LONDON006298 to 006301; LONDON005970 to 005972;
LONDON006147 to 006150; and LONDON006331 to 006334.**

3.6)     London broker correspondence and documentation, as per:- **Bates No:**

**000052 to 001069.**

3.7)     Expert Report of John E. Holford and all documents referenced therein.

3.8)     Expert Report of Dennis J. Connolly and all documents referenced therein.

3.9)     The Affidavit #1 of Richard Youell dated February 27, 2006.

3.10)    The transcript of the Deposition of Richard Youell taken on March 27, 2006.

3.11)    The transcript of the Deposition of Richard Youell taken on November 2 & 3,

2010 and the attached Exhibits.

3.12)    Coverage Chart for Cominco Ltd - General Liability Coverage – Property

Damage 1958 to 1986.

**4)      OPINIONS:**

4.1)     My opinions are set out in the following Sections of this report.

**5)      OBTAINING INSURANCE IN THE LONDON MARKET:**

5.1)     If an insured wishes to obtain insurance in the London market, the practice

which is not restricted to third party liability risks, but also applies to any

other risks for which coverage is sought, is in accordance with the following

recognised and accepted procedures.

5.2)     A Canadian or a United States insured must first of all contact a local

domestic broker. In the case of Cominco Ltd, they contacted the local

9

office of Johnson & Higgins Inc., Vancouver in the early 1970's. The domestic broker is also known as the producing broker. After taking instructions from the potential insured, the producing broker will generally give advice to the insured on the types of cover available to suit the needs of the insured and the insurance markets that may be willing to entertain the risk. If it is decided that the London market should be approached the producing broker will have to make contact with a broker in London and preferably a Lloyd's broker so that underwriters at Lloyd's London can be offered the risk. If the producing broker does not have a direct connection with a Lloyd's broker, or in the case of United States brokers in the period prior to the 1970's, the producing broker would pass the risk to a wholesale broker who has the appropriate connections with Lloyd's brokers. In addition, the insured must also disclose all information that is material to the risk.

5.3)    The Vancouver office of Johnson & Higgins had a working relation in 1972 with the Lloyd's broker, Willis, Faber & Dumas Limited and they were thus approached with Cominco's request for an excess third party legal liability policy to cover all of Cominco's operations in Canada, the United States and other parts of the world. Knowing the type of information LMI would require to consider Comico's risk, Johnson & Higgins would first of all work with Cominico to develop the required underwriting information which would have to include a complete description of the insured's operating facilities including the types of work carried out and the products, if any, that are manufactured. In addition there would have to be a full disclosure of the insured's past loss record and the nature of such losses both on a paid and outstanding basis. For certain types of risks, particularly umbrella risks that are underwritten at the first layer excess of a schedule of primary insurance,

18

10

the completion of an application form is required. The questions on the application form are typical of the information that underwriters require in order to consider an excess liability risk and even if an application form does not have to be completed; the questions asked form the basis of developing the information that the producing broker needs from the insured. This information will include the insured's Annual Revenue, Payroll, Number of Employees, Details of Underlying or Primary Insurance and any Exclusions that may be contained in these policies. In addition, the insured must also disclose all information that is material to the risk.

5.4)    By the 1970's in order to assist prospective underwriters in understanding the activities of an insured with diverse operations, it was the custom and practice to provide the underwriters with a copy of the insured latest annual report to their shareholders.

5.5)    On receipt of the instructions from the producing broker, the Lloyd's broker prepares a placing slip which sets out details of the insurance cover required. These details would include:-

a)    The type of risk to be insured. In the case of Cominco, their first policy at issue in this litigation which was effective August 29, 1972 was for Excess Umbrella Liability.

b)    For the policies at issue the wordings include the LRD 1960 Umbrella Wording and the LRD 1960 Short Excess Umbrella Wording or the London 1971 Umbrella Wording and the London 1971 Short Excess Umbrella Wording. If the broker is proposing some amendments to a standard wording, the placing slip would include the words "Wording to be agreed Leading Underwriter".

c)    Period of the insurance.

19

11

    d)      Limits of Liability

    e)      Underlying insurance or self insured retentions.

    f)      A provision for the Lead Underwriter to insert the required premium.

    g)      The commission required by the broker.

    h)      A provision for any applicable government taxes.

    i)      A heading for General Information which would provide information about the operations of the insured with references to further attached supporting information.

5.6)    The Lloyd's broker then presents his placing slip and information to a prospective Lead Underwriter who is experienced and qualified to underwrite the risk. If the Lead Underwriter is interested in the risk, he/she should after examining all the presented information be in a position to evaluate the risk exposures, agree to the proposed wording and if necessary impose further requirements, and then set a premium for risk. The Lead Underwriter will signify his/her agreement by placing the syndicate or company stamp on the placing slip together with a participation expressed as a percentage of the policy limit.

5.7)    The broker will usually obtain support from another underwriter before communicating the terms and conditions of the insurance to the producing broker. If the terms and conditions are acceptable to the insured, the Lloyd's broker will obtain further participations from LMI until 100% of the policy is completed.

5.8)    The Lloyd's broker provides evidence of the insured risk by sending a cover note to the producing broker which sets out information, other than the broker's commission, that is shown on the placing slip. The producing broker will then produce their own cover note which duplicates the Lloyd's

broker's cover note and this is sent to the insured. The cover note generally states that it will be replaced when the insured receives the issued and signed wording for the Lloyd's syndicates and any applicable wordings for the subscribing London company market.

**6)**     <u>**THE POLLUTION EXCLUSION:**</u>

6.1)     All the policies at issue contain a seepage, pollution and contamination exclusion known as NMA 1685 which states:-

**Industries, Seepage, Pollution and Contamination Clause No. 3**
*(Appoved by Lloyd's Underwriters Fire and Non-Marine Association)*

**This insurance does not cover any liability for:**

**(1) Personal Injury or Bodily Injury or loss of, damage to, or loss of property directly or indirectly caused by seepage, pollution or contamination, provided always that this paragraph (1) shall not apply to liability for Personal Injury or Bodily Injury or loss of or physical damage to or destruction of tangible property, or loss of use of such property damaged or destroyed, where such seepage, pollution or contamination is caused by a sudden, unintended and unexpected happening during the period of this insurance.**

**(2) The cost of removing, nullifying or cleaning-up seeping, polluting or contaminating substances unless the seepage, pollution or contamination is caused by a sudden, unintended and unexpected happening during the period of this insurance.**

**(3) Fines, penalties, punitive or exemplary damages.**

**This Clause shall not extend this Insurance to cover any liability which would not have been covered under this Insurance had this Clause not been attached.**

**22/1/70**
**MNA 1685**

6.2)     The effect of this Clause is such that cover is only available under the policies at issue when such seepage, pollution or contamination is caused by a sudden, unintended and unexpected happening during the period of each policy at issue.

13

6.3)   The clause requires the cause of the seepage, pollution and contamination to

be sudden, and thus the happening has to be abrupt and  limited in time and

place.

6.4)   At the time of placing and renewing Cominco's risk with LMI, I am of the

opinion that both Cominco and their producing broker, Johnson &

Higgins and also their Lloyd's broker fully understood the language and

purpose of the NMA 1685 Seepage, Pollution and Contamination exclusion

that is contained in the policies at issue. I understand from the deposition

testimony of Peter Smith taken on August 3, 2010 that Cominco recognised

the restrictions imposed by NMA 1685 on a possible occurrence resulting

from seepage, pollution and contamination. Consistent with Cominco's

understanding that the pollution exclusion requires the cause of the seepage,

pollution and contamination to be sudden, Cominco explored in late 1981 the

purchase of Environmental Impairment Liability to provide for their seepage,

pollution and contamination risks that were excluded in the policies issued by

LMI due to the inclusion of NMA 1685. In January of 1982 Cominco

received a comprehensive report from Mr Geoffrey T. D. Scott, Consulting

Engineer, on his site inspections at their various facilities which listed

the company's exposures to seepage, pollution and contamination.

6.5)   Prior to the inception on August 29, 1972 of the first policy at issue in the

litigation, Cominco received a letter from their broker, Johnson & Higgins

Willis Faber Ltd (Johnson & Higgins), dated March 10, 1970 addressed to Mr

A.  R. Tucker, Insurance Supervisor. The letter contained a request from

Continental Insurance Company's Vancouver (Continental) inspection corps

to have a general look at the Trail plants from a pollution standpoint. In

addition there was a request to inspect one or more of the W.K.P. & L-

22

managed Hydro Electric Power Plants. **(refer Bates No: MM_0003479)**.

6.6) In a letter dated August 7, 1970, Mr Tucker at Cominco wrote to Mr K. B.

Cook at Johnson & Higgins stating:

**"…we would not like to see an Environmental Pollution exclusion endorsement of the type used by INA imposed on our policy.**

**I feel that as a matter of public policy, underwriters are correct in refusing to insure organisations which are knowingly and wilfully dumping pollutants, but I am concerned that liability for pollution claims, resulting from conditions which existed many years ago, should not be excluded". (refer Bates No:MM_0003596)**.

Despite Cominco's expressed concern that the pollution exclusion excluded

coverage for conditions which existed many years ago, on August 12, 1970,

Johnson & Higgins wrote to Cominco and advised that Continental was not

prepared to revise its pollution exclusion and will only provide pollutions and

contaminants coverage on only an "accident" basis from August 29, 1970.

This exchange of correspondence demonstrates that Cominco understood that

its pollution exclusion excluded gradual pollution.

6.7) On September 1, 1970, Mr Tucker wrote to Mr N. M. Aked, at Cominco

American Inc., Spokane, Washington. **(refer Bates No: MM_0003540/41)**.

The letter encloses a report prepared by Continental in respect of their

inspection of Cominco's facility at N'Land Industries of Washington Inc.

Due to the casual approach to safety at this facility, the Continental's report

raises concerns with the pollution hazard relating to certain liquid fertilizer

tanks. The letter also advises that Comico's insurers have imposed a an

environmental exclusion whereby claims for damage due to pollution would

be excluded unless such damage to third party property was sustained as a

result of an accident. Mr Tucker also advises that Cominco may have

difficulty in establishing that third party damage resulted from an accident if

15

pollution occurred as a result of a failure in tank which was inadequately constructed or maintained.

6.8) I am of the opinion that that correspondence referred to at Sections 6.5) to 6.7) above shows Cominco's understanding of the pollution coverage available in their 1970 insurance policy with Continental and what was not covered by that policy. This point is further acknowledged by Cominco in Mr Tucker' letter to Johnson & Higgins dated September 10, 1970 **(refer Bates No:TML_0005162)**. The letter refers to the Continental's exclusion and a published exclusion by INA. Mr Tucker states in his letter:

**"Neither of these exclusion clauses provide for claims which may result from conditions which in the first existed some years ago when not considered to be injurious"**

According to the letter the Continental's pollution exclusion provides that it excludes claims resulting from contamination or pollution by various effluents unless the release or escape of such pollutants is sudden and accidental.

6.9) In Mr Tucker's letter to Johnson & Higgins referred to at Section 6.8) above, he asked if Continental would delete the contamination and pollution exclusion as he understood that under certain circumstances INA would agree to this request. Johnson & Higgins replied on October 6, 1970 to say that Continental would not agree to this request. **(refer Bates No: MM_0003513)**. The full language of Continental's Contamination or Pollution Exclusion is set out in Endorsement No. 11 to their Policy No. 3145674 issued to Cominco Ltd., et al. **(refer Bates No: MM_0004015).**

6.10) As reflected in Cominco's communications with its brokers, it is clear that Cominco understood that the term "sudden", as used in the pollution exclusion contained in the policies at issue, had a temporal meaning. This

understanding that "sudden" includes this temporal aspect is consistent with my discussions with brokers at Willis, Faber & Dumas Limited and other London brokers during the relevant time period of the policies at issue.

6.11    Based upon the long term pollution claim asserted by Cominco, the plain meaning of the pollution exclusion bars coverage for Cominco's insurance claim.

## 7)    EXHAUSTION OF UNDERLYING LIMITS:

7.1)    The policies at issue are all issued on the LRD 1960 Umbrella Wording which contains the following Conditions:

**Condition J – Loss Payable**

**Liability under this policy with respect to any occurrence shall not attach unless and until the Assured, or the Assured's underlying insurer, shall have paid the amount of the underlying limits on account of such occurrence. The Assured shall make a definite claim for any loss for which the Underwriters may be liable under the policy within twelve (12) months after the Assured shall have paid an amount of ultimate net loss in excess of the amount borne by the Assured or after the Assured's liability shall have been fixed and rendered certain either by final judgment against the Assured after actual trial or by written agreement of the Assured, the claimant, and the Underwriters. If any subsequent payments shall be made by the assured on account of the same occurrence, additional claims shall be made similarly from time to time. Such losses shall be due and payable within thirty (30) days after they are respectively claimed and proven in conformity with this policy.**

**Definition 6 – Ultimate Net Loss**

**The term "Ultimate Net Loss" shall mean the total sum which the Assured, or any company as his insurer, or both, become obligated to pay by reason of personal injury, property damage or advertising liability claim, either through adjudication or compromise, and shall also include hospital, medical and funeral charges and all sums paid as salaries, wages, compensation, fees, charges and legal costs, premiums on attachment of appeal bonds, interest, expenses for doctors, lawyers, nurses and investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits, which are paid as a consequence of any occurrence covered hereunder, excluding only the salaries of the Assured's or any underlying insurer's permanent employees.**

**The Company shall not be liable for expenses as aforesaid when such expenses are included in other valid and collectible insurance.**

**Condition L – Other Insurance**

**If other valid and collectible insurance with any other insurer is available to the Assured covering a loss also covered by this policy, other than insurance that is in excess of the insurance afforded by this policy, the insurance afforded by this policy shall be in excess of and shall not contribute with such other insurance. Nothing herein shall be construed to make this policy subject to the terms, conditions and limitations of other insurance.**

**Condition S – Maintenance of Underlying Insurances**

**It is a condition of this policy that the policy or policies referred to in the attached "Schedule of Underlying Insurances" shall be maintained in full effect during the currency of this policy except for any reduction of the aggregate limit or limits contained therein solely by payment of claims in respect of accidents or occurrences occurring during the period of this policy. Failure of the Assured to comply with the foregoing shall not invalidate this policy but in the event of such failure, the Company shall only be liable to the same extent as they would have been had the Assured complied with the said condition.**

7.2)    The purpose of these Conditions and the overall purpose of excess insurance

is to ensure that no payments are made for a covered occurrence until such

time as Cominco, or their underlying insurers, have paid the amount of all

available and applicable underlying insurance and or self insurance for such

covered occurrence.

7.3)    The terms of the Loss Payable Condition also require Cominco to make a

definite claim for any loss for which LMI may be liable under any

of the policies at issue within 12 months. Such claim by Cominco is subject

to them having paid an amount of ultimate net loss in excess of the amount

borne by Cominco. Alternatively, their liability shall have been fixed and

rendered certain either by final judgment against them after actual trial or by

written agreement of Cominco, the claimant, and LMI.

7.4)    Provided all the terms and conditions of the policy including the Loss

18

Payable Condition have been met, such losses shall be due and payable within 30 days after they are respectively claimed and proven in conformity with the policies at issue.

7.5)    The Insuring Agreement in the policies at issue require LMI to only be liable for the Ultimate Net Loss the excess of the underlying insured and/or self insured limits. Thus for the policies at issue to pay for a covered occurrence, all of the underlying insurance and/or self insurance has to be fully exhausted by payments as defined by the term "Ultimate Net Loss".

7.6)    In the event of there being other valid and collectable insurance available to the insured for a loss that is also covered by the policies at issue, the limits of liability for such other insurance must first be fully exhausted and these limits are treated as underlying insurance to the policies at issue.

7.7)    Cominco must maintain in full effect the underlying policies referred to in the Schedule of Underlying Insurances attached to the policies issued by LMI. The limits of the underlying policies must be fully exhausted by a covered claim before such covered claim can be paid by the policies issued to Cominco by LMI.

7.8)    The whole purpose of excess insurance, which is also reflected in its premium pricing structure, is that payment of excess limits for a covered occurrence does not take place until all the underlying limits have fully exhausted and paid in full for each covered occurrence.

7.9)    One policy limit is available for each covered occurrence during the period of the policy. Likewise all available and applicable underlying insurance and or self insurance must be fully exhausted and paid in full for each covered occurrence. For example if during a policy period there are five separate occurrences which exceed the underlying limit, and if the underlying limit is

$1 million and is not subject to an overall aggregate limit, the underlying

policy will pay a total amount of $5 million for the five separate occurrences

and the excess policy will also pay up to the amount of its limit for each of

the five separate occurrence.

**8)**   **PRIOR INSURANCE AND NON CUMULATION OF LIABILITY:**

8.1)   The policies at issue contain the following condition:

**Condition C – Prior Insurance and Non Cumulation of Liability**

The reason for the inclusion of Condition C in the LRD 1960 Umbrella

Wording is due to the prior history of umbrella wordings used by LMI. It is

therefore necessary to understand this history.

8.2)   The first umbrella wording used by LMI was issued in 1948 and was known

as the Price Forbes 1948 wording. This wording was subject to minor

modifications in 1956 and 1958 and in 1959. All of these wordings contained

a definition of occurrence known as the "event" language. Thus for a loss to

trigger coverage under a policy using these wordings, the causative event has

to be during the period of the policy

8.3)   In May 1960 a new umbrella wording was drafted by Leslie R Dew, who was

Chief Underwriter at the Merrett Syndicate at Lloyd's, and his Senior

Underwriter, Henry S. Weavers, who subsequently became the Chief

Underwriter at Weavers in 1963. This wording was known as the LRD 1960

Umbrella and although certain aspects of the wording were much the same as

the previous Price Forbes wordings, the most significant change was with

respect to the definition of occurrence. For a loss to trigger coverage under a

policy using this wording, the claimant's personal injury or property damage

has to be during the period of the policy. The event, however, can be before

the inception of the policy.

8.4)   With the introduction of the LRD 1960 wording described at Section 8.3) above, it was possible for an event to trigger coverage under a policy issued on the Price Forbes wording but if the personal injury or property damage did not occur until a later date, it could also be possible to trigger coverage for he same event under a renewal or subsequent policy using the LRD 1960 wording. Thus under these circumstances the insured could potentially obtain indemnity for the same loss under two policies. In order to address this situation, the drafters of the LRD 1960 wording incorporated an additional policy condition, which is Condition C "Prior Insurance and Non Cumulation of Liability".

8.5)   I wish to address the first paragraph of this Condition which states:

**It is agreed that if any loss covered hereunder is also covered in whole or in part under any other excess policy issued to the Assured prior to the inception date hereof the limit of liability hereon as stated in Item 2 of the Declarations shall be reduced by any amounts due to the Assured on account of such loss under such prior insurance.**

8.6)   The reason for the language in this paragraph is to address a situation whereby the same loss could trigger subsequent occurrence policies.

If a policyholder tries to assert a claim for the same loss occurrence under more than one policy, then the Prior Insurance and Non Cumulation Condition must be invoked.   In order to consider as to whether Condition C and Paragraph 1 is applicable in a given loss situation to a policy containing this Condition, full details of the nature and circumstances of the loss must be known to ascertain if a prior policy or multiple policies are  triggered for the same covered occurrence. If this is the case, the limit of liability of the policy is reduced by any amounts due to the Assured on account of such loss under such prior insurance.

**9)**     **NOTICE OF OCCURRENCE:**

9.1)     The policies at issue include a Notice of Occurrence Condition including that

which is found in the LRD 1960 Umbrella Wording at Condition G:

**Condition G – Notice of Occurrence**

**Whenever the Assured has information from which the Assured may
reasonably conclude that an occurrence covered hereunder involves
injuries or damages which, in the event that the Assured should be held
liable, is likely to involve this policy, notice shall be sent as stated in Item
3 of the Declarations as soon as practicable, provided, however, that
failure to give notice of any occurrence which at the time of its happening
did not appear to involve this policy but which, at a later date, would
appear to give rise to a claim hereunder, shall not prejudice such claims.**

9.2)     Certain of the policies at issue require the notice of occurrence to be given

after notice has been received by **"the Assured's Insurance Department at**

**its Executive Headquarters, Vancouver, B.C".** An example of this

Condition is found in **Policy Number 576/HP9582AOO** for the period June

30, 1977 to June 30, 1978.

9.3)     Failure to provide timely notice of a covered occurrence for injuries or

damage that are likely to involve the policies at issue will generally result in

prejudice. This is particularly true for claims where the injuries and or

damage do not become apparent until some time after the expiration of the

policy. With the passage of time key witnesses are often not available and

records pertaining to the exact nature and circumstances of the occurrence

can no longer be found.

9.4)     For the above mentioned reasons the Occurrence Condition in the policies at

issue must be complied with at all times and as soon as Cominco are aware of

a covered occurrence that is likely to involve the policies at issue they are

required to send written notice to the entity named in Item 3 of the

22

Declarations in the policies at issue.

9.5)    Based on my review of the information available to Cominco, as summarised at Section 10 of this report, I am of the opinion that Cominco did not provide timely notice and LMI have been substantially prejudiced as a result.

## 10)    MISREPRESENTATION:

10.1)    In accordance with the procedure for placing insurance with LMI, as set out at Section 5 of this report, Comico appears to have prepared  written presentations for submission to their brokers.

10.2)    I have reviewed documents that include correspondence between Cominco and Johnson & Higgins Willis Faber Ltd., Vancouver and correspondence between Johnson & Higgins Willis Faber Ltd., Vancouver and Willis Faber & Dumas Ltd., London during the period 1972 to 1984. This documentation also includes completed Umbrella Policy Applications for the policy years 1972 **(refer Bates No: TML_0014921 to 0014926)**, 1975 **(refer Bates No: TML_0013263 to 0013268)**, 1976 **(refer Bates No: TML_0013283 to 0013288)**, 1977 **(refer Bates No: TML_0013548 to 0013553)** and 1978 **(refer Bates No: TML_0013490 to 0013499)**,

10.3)    The general information that Cominco provided to its brokers does not advise its brokers, let alone LMI, of Cominco's overall non-marine and environmental exposures.

10.4)    I have also been provided with copies of the information prepared by Cominco for the renewal of their Worldwide Liability Insurance for the periods commencing June 1, 1979 June 1, 1982,  June 1, 1983, June 1, 1984 and June 1, 1985. The general information that Cominco provided to its brokers does not advise its brokers, let alone LMI, of Cominco's

overall non-marine and environmental exposures.

10.5)    The renewal information is identified with the following Bates Numbers:

1979 Renewal – **Bates No: MM_0000729 to 0000787**
1982 Renewal – **Bates No: TML_0004555 to TML_0004591 and at**
                          **Bates No: MM_0000820 to MM_0000856**
1983 Renewal – **Bates No: TML_0004592 to TML_0004656**
1984 Renewal – **Bates No: TML_0004657 to TML_0004721**

1985 Renewal – **Bates No: TML_0004722 to TML_0004787**

10.6)    In each of the above mentioned renewal presentations there is a section that

addresses Environmental Control. See **Bates No: TML_0004590 to**

**TML_0004591** of the 1982 renewal information. The last paragraph of this

section on **Bates No: TML_0004591** states:

**A survey has been made by an independent consultant with a view to**
**seeking coverage for environmental impairment. This survey was done in**
**July, 1981 and encompassed locations at Trail, Kimberley, Pine Point,**
**Con Mine, and Vancouver, where Cominco has several small operations.**
**A technical evaluation was also made of all other Cominco Canadian**
**operations.**

Certainly, none of the operations at the Trail location could be characterised

as small operations.

The above referenced survey at **Bates No: TML_005347 to TML005440**

was prepared by Geoffrey T. G. Scott, Consulting Engineer, (the Scott

Report) and is dated January 1982.

10.7)    The Scott Report raises serious concerns about Cominco's known and

expected seepage, pollution and contamination exposures. These concerns are

addressed in a letter dated November 20, 1981 from E. N. Doyle at Cominco

to Mr D. A. MacCulloch, Corporate Risk Manager at Cominco, Vancouver.

**(See BatesNo: MM_0000314 to MM_0000317)** in response to an initial

Scott report. Mr Doyle acknowledges in his letter that Cominco has seepage,

pollution and contamination exposures at sites identified by the Scott Report

and particularly with respect to mercury pollution resulting from the

elimination of heavy metal from Cominco's various effluents that are

discharged into rivers. The letter on page 2, amongst other things, refers to

Section 8.13 of the Scott Report where it states:

**"I agree with Scott's comments concerning mercury. There is no question in my mind that this is the single most vulnerable area that Cominco may have to face up to if the Americans ever find time and money to do exhaustive research on lake sediments in FDR Lake between the dam and the head waters".**

The letter further states:

**"In Section 8.13, there is no question that we are at risk in terms of the deposition of heavy metals that has taken place over the last 70 to 80 years".**

10.8)   A further letter dated February 15, 1982 from Mr Doyle to Mr MacCulloch,

after his review of the finalised Scott Report, raises the items of risk that are

of most importance to Cominco and lists them in importance **(See Bates No:**

**TML_0004877 to TML0004879)**. The first item is:

**"(1) Discharge of heavy metals to the Columbia River. This has particular relevance to mercury and cadmiun which, for several years, have been at a higher level than is desirable…it is possible that a private individual could bring action under the Fisheries Act and this could lead to some concern…it may well be that individuals, particularly in the United States, could bring action if they were using water for, for example, irrigation or manufacturing purposes".**

10.9)   I have reviewed the deposition transcript of Peter Smith taken on August 3,

2010. Before Mr Smith joined Cominco he was an underwriter with certain

insurance companies in London. Mr Smith was asked and responded to the

following questions:

**At Page 17, Line 6 to Page 18, Line 5.**

*Q.  Okay. Did you understand that there's a principle of utmost good faith in the broker presenting the risk for your consideration?*

*A.  Yes.*

Q. *What did you understand to be the principle of utmost good faith?*

A. *Disclosing any information that you feel would influence an underwriter's decision in acceptance or pricing of the risk.*

Q. *Okay. And that was your understanding as to what the obligation of the broker that was presenting the risk to you; correct?*

A. *Yeah, I believe that that was his obligation or his client's obligation.*

Q. *Did that belief ever change during the time that you worked in the insurance profession?*

A. *No.*

At Page 24, Line 5 to 18.

Q. *Because you expected the broker to present to you with all circumstances material to the risk; correct.*

A. *I would expect the broker to give me what information he had that was relevant.*

Q. *Well it was your understanding that the broker was going to present to you the information that broker felt to be relevant to the risk; correct?*

A. *Yes.*

At Page 102, Line 17 to 25 and Page 103, Line 7 to 12.

Q *How about for placement purposes, wouldn't you have reviewed the Scott report at the time for placement or renewal of insurance for Cominco?*

A. *I may have, but I can't remember that I did or didn't.*

Q. *Isn't it likely that – that this is the type of information you thought was important to review for the placement of Cominco's insurance?*

A. *I think it could be.*

Q. *Sure. And if you would have reviewed this report, would you have Wanted...this type of information that's contained in Exhibit 101 that's the Scott report, the information in this report to have been provided to underwriters for the purposes of insurance – placement of insurance?*

A. *I wouldn't have any objection to them having it.*

At Page 106, Line 9 to 22.

Q. *And what if you were providing a policy with regard to general liability,*

26

*and you reviewed this document [Scott report] that there were certain discharges of heavy metals into the Columbia River from the Trail operation?... As an underwriter, is that the type of information that you would want to know about?*

A. *I would say yes.*

Q. *Why is that?*

A. *I want to know what I'm getting into, decide whether I want to accept it or, if I do, under what terms and conditions.*

**Page 107, Line 7 to 10.**

Q. *You want to know the positive information about the applicant for insurance and the negative information; correct?*

A. *Certainly.*

**At Page 172, Line 7 to Page 173, Line 7.**

Q. *Now, do you know – do you know what information Cominco's brokers actually presented to underwriters or insurers for the purposes of placement of coverage?*

A. *I wasn't with them at the handing over of the information, so it was my understanding that they would have turned over the whole package.*

Q. *Okay.*

A. *As presented from questions that often come back on things that insurers were puzzled about or wanted further information, I have no reason to think that they withheld any part of it.*

Q. *What is the basis of your understanding that all of the information that we just went over in Exhibit L – that document – would have been handed over to London Market Insurers for underwriting purpose?*

A. *Well, the basis of the understanding would be that it was the professional thing for them to do, and based on my own subsequent dealings with questions that arose from documents on occasions. I mean, sometimes there were lots of questions, particularly when the market was tough. And sometimes there were no questions.*

10.10) I am of the opinion that Peter Smith knew exactly the type of information he

needed to produce in order that his brokers could make the necessary

presentations to LMI to obtain the placement or renewal of Cominco's

Worldwide Liability Insurance. This understanding is demonstrated through

27

Peter Smith in his deposition testimony cited above.

10.11) During Peter Smith's deposition on August 3, 1010 he was also asked and responded to the following questions:

**At Page 174, Line 17 to Page 175, Line20.**

*Q. And sir, have you seen this before?*

*A. Not that I can recall. I certainly don't think I have seen the letter on front here.*

*Q. Okay. The letter on the first page is from Johnson & Higgins, Vancouver, British Columbia, Peter Joyce to Gordon McCall, Willis, Faber and Dumas in London, England dated June 8, 1982; correct?*

*Q. Is that right?*

*A. Yes.*

*Q. Okay. "re Cominco Limited, marine umbrella cover notes HR", and then it gives some numbers there; correct?*

*A. Yep.*

*Q. Further to our discussion in New York regarding the above, we now take pleasure in enclosing a complete submission as supplied by Cominco, including their worldwide liability insurance underwriting information, and a copy of the comprehensive business liability policy issued by the Halifax Insurance Company. Do you see that?*

*A. Yes.*

*Q. Okay. Now, sir, could you look through this exhibit and see whether or not what your broker in Vancouver forwarded on to your broker in London made any reference to the Scott report.*

**At Page 176, Line 16 to Page 177, Line 3.**

*Q. And at Exhibit 110 are documents out of Willis's file. And over the time we were off the record, you had an opportunity to review that document to see whether or not there was any reference to the Scott report. Did you see any reference to the Scott report in-*

*A. No, I didn't.*

*Q. Exhibit 110? Okay. Did you see any reference in Exhibit 110 to the environmental controls.*

*A. No, I didn't.*

36

28

*Q. Okay. Did you see any reference in Exhibit 110 to the information about Comico in brief or the introduction.*

*A. No, I didn't see any of that.*

**At Page 177, Line 21 to Page 178, Line 13.**

*Q. ...Okay. But what you didn't see was the information you had requested from Nigel Doyle that Teck had forwarded on to its insurance broker; correct?*

*A. Correct.*

*Q. Do you have any explanation as to why the information that is contained in Exhibit J to Mrs Chalmers' declaration that we went over was not contained in the information that Mr Joyce was apparently forwarding on to Mr McCall?*

*A. I don't – I don't have any idea why. I'm quite shocked to see the – the discrepancy.*

*Q. Okay. Why are you shocked to see the discrepancy?*

*A. Well, I'm very shocked if they did it by design. I'm less shocked if they did it by accident ...*

**At Page 180, Line 19 to Page 181, Line 10.**

*Q. And sir, you made the statement that you were shocked if the information that Cominco provided to its broker that we've gone over was not included in Exhibit 110 and 111 wasn't passed on; correct?*

*A. Yes.*

**At Page 182, Line 4 to 10.**

*Q. Okay. Now, you said that you would be shocked if the information was not passed on. If your brokers omitted that information by design from not forwarding it on, would you still be shocked?*

*A. I think I'd be more shocked.*

*Q. Okay. Why would you be more shocked?*

*A. Well, it's a very unprofessional way to behave.*

10.12) I am of the opinion that material information was withheld by Cominco and or their brokers. An example of the material information is described in the above mentioned Sections of this report. The general information that

37

Cominco provided to its brokers does not advise its brokers, let alone LMI, of Cominco's overall non-marine and environmental exposures.

10.13)  My opinion is based on the testimony of Peter Smith cited and quoted at the foregoing Sections of this report and my review of the underwriting information prepared and submitted by Cominco to their brokers. It is also based on the exchange of correspondence, that is cited in this report, between Mr E. N. Doyle and Mr D. A. MacCullouch in response to the findings in the Scott Report. My opinion is also based on London Market Insurers' Responses to Plaintiff's Second Set of Interrogatories and Third Set of Requests for Production.

10.14)  Cominco and/or their brokers thus failed to pass to LMI the information that was known to Cominico at the time of the placement of Cominco's Worldwide Liability Insurance. In my opinion this information not disclosed to LMI would have been material to LMI's underwriting decision.

## 11)  UTMOST GOOD FAITH

11.1)  The doctrine of "Utmost Good Faith" is inherent in all policies of insurance and is one of the principles of the Marine Insurance Act of 1902 which is the basis for governing the regulation of insurance.

11.2)  The term "Utmost Good Faith" is sometimes referred to by its Latin name "uberrimae fidei". This is a legal doctrine which imposes a duty on the insured that requires all questions to be answered honestly and the risk not misrepresented.

11.3)  Failure by the parties proposing an insurance contract to abide by the doctrine of "Utmost Good Faith" constitutes a non-disclosure or concealment that can render the insurance null and void by the insurer.

12)    **FORTUITY**

12.1)    The concept of fortuity is an indispensable component of any form of

insurance. The fortuity doctrine arises from the basic concept that insurance

covers risks, rather than losses that were anticipated, expected, intended or

planned by the insured.

12.2)    Expected and intended occurrences are simply not covered regardless of the

language used in the definition of occurrence for the policies issued to

Cominco is only provided for personal injuries or property damage that is

fortuitous.

12.3)    At the Shell Oil Company trial, Mr Lelie R. Dew (drafter of the LRD 1960

Umbrella Wording) gave testimony on December 10, 1987 regarding fortuity.

He confirmed the concept in the trial transcript at:-

**Page 3038, Lines 9 – 13 and Lines 23 – 25; Page 3039, Lines 1 -10:**

Q.    *I believe that you testified in response to Mr. Ostrager's question*

*that it was the view of all casualty underwriters at Lloyd's that all*

*accident and occurrence liability policies required a fortuity for*

*coverage to apply. …*

*Is that an accurate characterization of your testimony ?*

A.    *It is.*

Q.    *And I would like you to define for the court your understanding of*

*the term fortuity as it is used in the liability context ?*

A.    *I think basically it is used in a straight forward common sense*

*definition of what is fortuity. Something unexpected. Something*

*happens which is certainly not expected. And anything except a term*

*life assurance policy or something like that, must have this element*

31

*of fortuity before you can produce an insurance claim.*

12.4)   I fully concur with the testimony Leslie Dew gave as set out at Section 12.3).

**13)    SERVICE SUIT CLAUSE**

13.1)   I am of the opinion that all of the policies contain a Service of Suit Clause. This is because the insurers are all based outside Canada and it is the custom and practice for policies issued by LMI to have included in the policy conditions a provision that advises the policyholder where to serve a suit on LMI, in the event that LMI fail to pay any amount claimed to be due under the policies at issue, and the jurisdiction to which Cominco and LMI must submit.

13.2)   The Service of Suit Clause used by LMI is approved by Lloyd's Underwriters' Association and is in a pre-printed format that is attached to the inside of the policy jacket for the respective policies issued by LMI.

13.3)   The service of Suit Clause attached to **Policy No: HN9620A00** issued to Coninco states:

**SERVICE OF SUIT CLAUSE (CANADA) (MARINE)**

*(Approved by Lloyd's Underwriters Association)*

**It is agreed that in the event of failure of Underwriters hereon to pay any amount claimed to be due hereunder, Underwriters hereon, at the request of the Assured, will submit to the jurisdiction of any Court of competent jurisdiction within Canada and will comply with all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance the law and practice of such Court.**

32

It is further agreed that process in such suit may be made upon Walter C. Leggat, Q.C., Suite 1200, Bank of Montreal Building, 129 St James Street, Montreal, QUE H2Y 1L8, Canada, and that in any suit instituted against any one of them upon this contract, Underwriters will abide by the final decision of such Court or any Appellate Court in the event of an appeal.

Walter C. Leggat, Q.C., is authorised and directed to accept service of process on behalf of Underwriters in any such suit and/ or upon the Assured's request to give a written undertaking to the Assured that he will cause a general appearance to be entered on Underwriter's behalf in the event such a suit shall be instituted.

13.4)   The policies at issue are therefore subject to the jurisdiction and law of Canada.

**CONCLUSION:**

16.1)   I reserve the right to amend this report if I am provided with additional documents that may require me to comment further on the existence of the policies at issue in this litigation and the terms and conditions of such policies.

16.2)   I also reserve the right to provide additional rebuttal opinions as necessary.

Signed:.................................................
       Peter S. Wilson

Dated:..DECEMBER 1, 2010..............................

41

**EXHIBIT I**

## CURRICULUM VITAE
## OF
### PETER STRINGER WILSON

ADDRESS: Briar House, Beacon Road, Ditchling, East Sussex, BN6 8UL, England

DATE OF BIRTH: 2 September 1941

EDUCATION: Whitgift School, Croydon, England (public high school)

EMPLOYMENT: **PRICE FORBES AND COMPANY LTD.** (December 1958-April 1963)

I joined a major Lloyd's broking firm, Price Forbes and Company, as a trainee in its North American Department. In September 1959, I was appointed as a Junior Casualty Broker assisting with the placement of excess North American casualty risks and arranging market capacity for first layer and high excess umbrella and general third-party risks. I was promoted to Senior Casualty Broker in mid-1961, specializing in large North American casualty accounts. In that capacity, I was responsible for placing liability insurance on behalf of major risks domiciled in the U.S. and Canada, negotiating premium terms and coverage conditions with "leading" underwriters in both the Lloyd's and London Company Markets on behalf of our clients, the prospective insureds.

**H. S. WEAVERS (UNDERWRITING) AGENCIES, LTD.** (April 1963-June 1990)

Underwriting agents for various insurance companies, H. S. Weavers grew from its founding in January 1963 to become one of the predominant underwriters of North American casualty business in the London Market during the 1970's and 1980's. I joined as Assistant Underwriter, specializing in North American casualty business. In October 1967, I was appointed Senior Underwriter of H. S. Weavers, and also made a Director of the company. I was subsequently elevated in 1974 to Managing Director until September 1989 and also in 1974 to Chief Underwriter, a position I held for the remainder of my tenure at H. S. Weavers. In January 1977, I was appointed a Director of the parent company of H. S. Weavers, London United Investments plc. Finally, I became Deputy Chairman of the Board of Directors of H. S. Weavers in September 1989, a position I held until I retired from the company in June 1990.

In addition to my underwriting duties, I was also directly responsible for handling claims under policies underwritten by H. S. Weavers from the time I joined the company until 1966, when I appointed a Claims Manager who, and all subsequent Claims Managers, reported to me on a daily basis. I was also heavily involved in certain policy drafting activities while at H. S. Weavers – notably, the London 1971 umbrella wording (in its various forms) and the 1985 Claims Made Excess Liability wording.

**BERESFORD CONSULTANTS LIMITED** (June 1990 – Present)

For the past 20 years, I have served as a consultant specializing in the representation of London, European, and U.S. insurers and reinsurers in connection with coverage litigation issues. In recent years, I have represented policyholders with respect to insurance disputes as well as reinsureds for coverage disputes.

My work also includes testifying at depositions and arbitration hearings both in the United Kingdom, Central Europe and the United States and court trial proceedings in the United Kingdom and the United States. I have provided deposition fact and expert testimony for 167 matters and arbitration and trial testimony for 32 matters which in all has been 275 days of testimony to-date.

During 2008 and 2009 I attended and completed the Addleshaw Goddard (a firm of London solicitors) Insurance/Reinsurance Arbitration Course to qualify as an Arbitrator in insurance and reinsurance disputes.

INSURANCE
COMPANY
DIRECTORSHIPS:   I am not currently a director of any insurance or reinsurance company, but between 1970 and 1990, I served on the boards of directors of various insurance and reinsurance companies domiciled in the United Kingdom, Bermuda, and the United States.

OTHER
DIRECTORSHIPS:   I currently hold directorships in the following companies: Beacon Nominees Limited; Beresford Consultants Limited; Beresford Registrars Limited; Hostgrange Limited; Doyobi Limited; Lochdeal Limited; Newhaven Services Limited; Pink Designs Limited.

C.V. UPDATED:   1 October 2010

**EXHIBIT II**

## PETER STRINGER WILSON

### DEPOSITION TESTIMONY

| | |
|---|---|
| Northern States Power Company | January 10, 2006 |
| Brush Wellman Inc | January 31, 2006 |
| Argonaut Insurance Co (Hughes Aircraft Inc) | March 21, 2006 |
| Deere & Company | September 6, 2006 |
| GAF Roofing Inc | September 26, 2006 |
| American Optical Inc | December 6, 2006 |
| | December 7, 2006 |
| Safety-Kleen Environmental Systems | December 20, 2006 |
| Unocal V. Lexington Insurance Company | January 8, 2007 |
| Allstate Insurance Co | |
| (R/I Argonaut Insurance Company) | July 25, 2007 |
| Foster Wheeler | February 21, 2008 |
| E I Dupont de Nemours Inc | April 24, 2008 |
| Cornell - Dubilier Electronics Inc. | October 22, 2008 |
| Cornell - Dubilier Electronics Inc. | March 4, 2009 |
| Citgo Company | February 10, 2010 |
| Blackstone Valley Gas & Electric Co. | March 18, 2010 |
| AIU (Policies issued to Foster Wheeler) | March 24, 2010 |
| BASF Catalysts LLC (f/k/a Engelhard Corp) | June 11, 2010 |
| Chicago Bridge & Iron Company | October 6, 2010 |
| Southern Indiana Gas & Electric Company | October 14, 2010 |

### TRIAL TESTIMONY

| | |
|---|---|
| Argonaut Insurance Co | |
| (Hughes Aircraft Inc) | November 2, 2006 |
| Deere & Company | May 29, 2007 |
| Glaxo SmithKline plc (Arbitration) | January 27, 2010 |